**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ROBERT MOSS, individually and as
general guardian of his minor
child; ELLEN TILLETT, individually
and as general guardian of her
minor child; FREEDOM FROM
RELIGION FOUNDATION,
INCORPORATED; MELISSA MOSS,

*Plaintiffs-Appellants,*

v.

SPARTANBURG COUNTY SCHOOL
DISTRICT SEVEN, a South Carolina
body politic and corporate,

*Defendant-Appellee.*

No. 11-1448

AMERICAN HUMANIST ASSOCIATION;
SECULAR STUDENT ALLIANCE,

*Amici Supporting Appellants,*

THE NATIONAL LEGAL FOUNDATION;
STATE OF SOUTH CAROLINA ex rel.
ALAN WILSON, ATTORNEY GENERAL;
THE CHRISTIAN LEGAL SOCIETY;
NATIONAL COMMITTEE FOR
FURTHERANCE OF JEWISH EDUCATION;
NATIONAL ASSOCIATION OF
EVANGELICALS; ADVOCATES FOR
FAITH AND FREEDOM;
COMMONWEALTH OF VIRGINIA;
STATE OF ALABAMA; STATE OF
COLORADO; STATE OF FLORIDA;
STATE OF LOUISIANA; STATE OF
MICHIGAN; STATE OF NEBRASKA;
STATE OF OKLAHOMA,

     *Amici Supporting Appellee.*

Appeal from the United States District Court
for the District of South Carolina, at Spartanburg.
Henry M. Herlong, Jr., Senior District Judge.
(7:09-cv-01586-HMH)

Argued: March 20, 2012

Decided: June 28, 2012

Before NIEMEYER, GREGORY, and WYNN,
Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Gregory and Judge Wynn joined.

## COUNSEL

**ARGUED:** George Daly, Charlotte, North Carolina, for Appellants. Lori Halstead Windham, BECKET FUND FOR RELIGIOUS LIBERTY, Washington, D.C., for Appellee. **ON BRIEF:** Eric C. Rassbach, Luke W. Goodrich, Eric N. Kniffin, BECKET FUND FOR RELIGIOUS LIBERTY, Washington, D.C., for Appellee. William J. Burgess, APPIGNANI HUMANIST LEGAL CENTER, AMERICAN HUMANIST ASSOCIATION, Washington, D.C., for American Humanist Association and Secular Student Alliance, Amici Supporting Appellants. Steven W. Fitschen, Douglas E. Myers, Virginia Beach, Virginia, for The National Legal Foundation, Amicus Supporting Appellee. Alan Wilson, Attorney General, James Emory Smith, Jr., Assistant Deputy Attorney General, Columbia, South Carolina, for the State of South Carolina ex rel. Alan Wilson, Attorney General, Amicus Supporting Appellee. James K. Lehman, Jay T. Thompson, James B. Glenn, NELSON MULLINS RILEY & SCARBOROUGH, LLP, Columbia, South Carolina, for the Christian Legal Society, National Committee for Furtherance of Jewish Education, National Association of Evangelicals, and Advocates for Faith and Freedom, Amici Supporting Appellee. Kenneth T. Cuccinelli, II, Attorney General of Virginia, E. Duncan Getchell, Jr., Solicitor General of Virginia, Charles E. James, Jr., Chief Deputy Attorney General, Wesley G. Russell, Jr., Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Commonwealth of Virginia, State of Alabama, State of Colorado, State of Florida, State of Louisiana, State of Michigan, State of Nebraska, and State of Oklahoma, Amici Supporting Appellee.

---

## OPINION

NIEMEYER, Circuit Judge:

In 2007, South Carolina's Spartanburg County School District Seven adopted a policy allowing public school students

to receive two academic credits for off-campus religious instruction offered by private educators. The parents of two students at Spartanburg High School commenced this action against the School District, alleging that the policy impermissibly endorses religion and entangles church and State, in violation of the Establishment Clause of the First Amendment.

The School District filed a motion for summary judgment, contending (1) that the plaintiffs lacked standing because they were not injured by the policy, and (2) that the policy, in any event, was constitutional in that it was neutrally stated and administered and that it had the secular purpose of accommodating students' desire to receive religious instruction. The plaintiffs filed a cross-motion for summary judgment, arguing that that the purpose and primary effect of the School District's policy was to promote Christianity. The district court rejected the school district's standing argument but agreed with it on the merits and, accordingly, granted summary judgment to the School District.

For the reasons that follow, we affirm.

I

Since at least 1992, a number of school districts in South Carolina have allowed students to be released for part of the school day in order to receive off-campus religious instruction. Initially, the students who availed themselves of this opportunity did not receive grades or academic credit, which made enrollment difficult for some students. In 2006, the South Carolina General Assembly found that "the absence of an ability to award [academic credit] ha[d] essentially eliminated the school districts' ability to accommodate parents' and students' desires to participate in released time programs," 2006 S.C. Acts 322, and it responded by enacting the Released Time Credit Act. The Released Time Credit Act provides in part:

A school district board of trustees may award high school students no more than two elective Carnegie units for the completion of released time classes in religious instruction . . . if:

> (1) . . . the released time classes in religious instruction are evaluated on the basis of purely secular criteria that are substantially the same criteria used to evaluate similar classes at established private high schools for the purpose of determining whether a student transferring to a public high school from a private high school will be awarded elective Carnegie units for such classes . . . and

> (2) The decision to award elective Carnegie units is neutral as to, and does not involve any test for, religious content or denominational affiliation.

S.C. Code Ann. § 59-39-112(A). The Act specifies that the "secular criteria" for evaluation include but are not limited to:

> (1) number of hours of classroom instruction time;

> (2) review of the course syllabus which reflects the course requirements and materials used;

> (3) methods of assessment used in the course; and

> (4) whether the course was taught by a certified teacher.

*Id.* § 59-39-112(B).

Soon after the General Assembly enacted the Released Time Credit Act, Spartanburg County School District Seven

adopted a released time policy, dated March 6, 2007. The policy states in part:

> The district will accept no more than two elective Carnegie unit credits for religious instruction taken during the school day in accordance with this policy. The district will evaluate the classes on the basis of purely secular criteria prior to accepting credit. The district will accept off-campus transfer of credit for released time classes with prior approval.

The policy requires that released time courses be taken "away from school property," without the assistance of public staff or funding. The policy also directs that "district staff and faculty . . . not promote or discourage participation by district students in a released time program."

Early in 2007, a private, unaccredited religious education organization, Spartanburg County Bible Education in School Time ("Spartanburg Bible School"), approached a number of South Carolina school districts, including Spartanburg County School District Seven, requesting that they allow students to participate in a released time religious course—a two-semester Christian worldview class—for academic credit. In discussions with School District Seven, the school officials conveyed their preference that administrators receive grades under the released time program as *transfer* credits from *accredited* private schools, rather than from *unaccredited* education providers, such as Spartanburg Bible School. This arrangement would be consistent with the School District's practice of receiving grades awarded by a private school, including grades for religious courses, when a private school student transfers into public school. The officials explained that by receiving released time grades through a private school "transfer transcript," the School District could obviate the need for school officials to become involved in assessing the "quality" of religious released-time courses.

Following the School District's preference, Spartanburg Bible School entered into an arrangement with Oakbrook Preparatory School, an accredited private Christian school, by which Spartanburg Bible School could submit its grades through Oakbrook to Spartanburg High School. Under the arrangement, Oakbrook agreed to review and monitor Spartanburg Bible School's curriculum, its teacher qualifications, and educational objectives, and to award course credit and grades given by the Bible School before transferring them to Spartanburg High School. In carrying out the arrangement, Oakbrook reviewed syllabi, spoke with instructors, suggested minor curricular adjustments, and satisfied itself that the Spartanburg Bible School course was academically rigorous.

After Spartanburg Bible School began its instruction under the arrangement with Oakbrook and Spartanburg High School, Spartanburg High School never actively or directly engaged in promoting the Spartanburg Bible School course or any other released time course. The Spartanburg Bible School course was not listed in the Spartanburg High School course catalog, and the Bible School was not permitted to advertise itself in Spartanburg High School classrooms. While the Bible School did provide Spartanburg High School guidance counselors with flyers, the counselors were authorized to discuss Spartanburg Bible School or the flyers with parents and students only after they expressed an interest in learning about the program. Spartanburg High School did, however, allow Spartanburg Bible School to staff an informational table at its annual registration open house for parents and students, as it did for other outside organizations, such as military and college recruiters.

Over a period of three years, 20 Spartanburg High School students, out of the roughly 1,500 students in the school each year, elected to participate in the released time course at Spartanburg Bible School.

The plaintiffs—Robert Moss, the parent of Melissa Moss, who attended Spartanburg High School and has now gradu-

ated; Melissa Moss, in her own right; Ellen Tillett, for herself and on behalf of her minor child who attends Spartanburg High School; and the Freedom From Religion Foundation, Inc.—commenced this action in June 2009 against School District Seven, pursuant to 42 U.S.C. § 1983, alleging that School District Seven's released time policy violates the Establishment Clause of the U.S. Constitution.

The record shows that neither of the two student plaintiffs participated in the Spartanburg Bible School course, nor did they claim to have been harassed in any way for not so participating. Moreover, both students were not adversely affected by released time grades, as they had higher GPAs than any of their classmates who did participate in the Spartanburg Bible School course. The student plaintiffs also did not claim to have seen Spartanburg Bible School personnel on Spartanburg High School grounds or to have encountered at the High School any efforts at advertising or promoting the Spartanburg Bible School. The Mosses, however, did receive a promotional letter in the mail from Spartanburg Bible School, which indicated that the school would be conducting a released time course which "will be available for elective credit to students who attend Spartanburg High School." The course would "help students learn the basic tenets of the Christian worldview," and it would teach students "how they ought to live as a result of what they have learned." While the School District did provide Spartanburg Bible School with the addresses of students so that it could send the promotional letter, School District and high school officials did not review or approve the letter before it was sent.

On the parties' cross-motions for summary judgment, the district court entered judgment in favor of School District Seven. In doing so, the court applied the framework established in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971), and concluded that the School District's released time policy did not violate the three-part *Lemon* test adopted for enforcing the Establishment Clause. As to the first prong, focusing on

*purpose*, the court concluded that the School District's "stated purpose for its release time program, the accommodation of religion, [was] plausible and therefore [had to] be accepted"; that this purpose was secular; and that the plaintiffs "have failed to show that the School District harbored an impermissible religious motive." On the second prong, focusing on *effect*, the court concluded that the plaintiffs failed to establish that "the adoption and implementation of the School District's released time policy ha[d] the principal effect of advancing religion" and that, viewed from the perspective of an objective observer, the School District's policy "[did] no more than merely accommodate students' desire to partake in religious instruction." Finally, with respect to the third prong, focusing on *entanglement*, the court concluded,

> By limiting the acceptance of academic credit [to grades] from accredited schools, the School District's released time policy was designed to disentangle the School District from reviewing the religious content of released time instruction. The policy [was] cast in neutral terms and allow[ed] its students to petition for released time religious instruction regardless of the specific religion or denomination. Plaintiffs have failed to show how the School District's passive acceptance of academic credit for religious instruction constitute[d] excessive entanglement with religion.

From the district court's judgment, dated April 5, 2011, the plaintiffs filed this appeal.

## II.   Standing

The School District contends first that plaintiffs lack standing to challenge the constitutionality of the released time policy because they were not injured by the policy.

The Constitution limits the jurisdiction of federal courts to resolving "Cases" and "Controversies." U.S. Const. art. III,

§ 2, cl. 1. One aspect of the case-or-controversy requirement is that a federal lawsuit must seek to prevent or redress an "actual or imminently threatened injury" to the plaintiff. *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009). Plaintiffs may not establish their standing to bring suit merely because they disagree with a government policy, *see Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1449 (2011), or because they share the "generalized interest of all citizens in constitutional governance," *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 217 (1974).

Relying on cursory remarks about standing in the footnotes of two Supreme Court decisions, the plaintiffs propose that we adopt a *per se* rule that students and parents *always* have standing to bring suit against policies at their school when they allege a violation of the Establishment Clause, regardless of whether they allege or can prove personal injury. *See Sch. Dist. of Abington v. Schempp*, 374 U.S. 203, 224 n.9 (1963) (finding standing where students and parents were "directly affected by the laws and practices against which their complaints are directed"); *Zorach v. Clauson*, 343 U.S. 306, 309 n.4 (1952) (finding standing because, "unlike the appellants in [*Doremus v. Board of Education*, 342 U.S. 429 (1952)] . . . , appellants here are parents of children currently attending schools subject to the released time program").

The plaintiffs' argument, however, reads far too much into the unremarkable discussions of standing in *Schempp* and *Zorach*. Neither case justifies the sweeping conclusion that parents and students currently in school may challenge the constitutionality of school policies without demonstrating that they were personally injured in some way by those policies. The *Zorach* footnote merely states that one of the impediments that undermined standing in *Doremus*—specifically, the child of the parent plaintiff had graduated since the complaint was filed and therefore was no longer subject to the school's allegedly unconstitutional policies—did not present a problem in *Zorach* because the affected students were still

attending the school. And *Schempp*, far from suggesting that *all* students or parents have standing to object to unconstitutional school policies, conferred standing only because the students bringing suit were "*directly affected* by the laws and practices against which their complaints [were] directed." 374 U.S. at 224 n.9 (emphasis added).

While the plaintiffs are not exempt from the basic constitutional requirement that they be injured and thus have a concrete stake in the dispute, we have nonetheless recognized that standing principles must be "tailored to reflect the kind of injuries Establishment Clause plaintiffs are likely to suffer." *Suhre v. Haywood Cnty.*, 131 F.3d 1083, 1086 (4th Cir. 1997). Many of the harms that Establishment Clause plaintiffs suffer are "spiritual" and "value-laden," rather than tangible and economic. *ACLU v. Rabun Cnty. Chamber of Commerce, Inc.*, 698 F.2d 1098, 1102 (11th Cir. 1983). Consequently, plaintiffs have been found to possess standing when they are "spiritual[ly] affront[ed]" as a result of "direct" and "unwelcome" contact with an alleged religious establishment within their community. *Suhre*, 131 F.3d at 1086-87; *see also Saladin v. City of Milledgeville*, 812 F.2d 687, 693 (11th Cir. 1987) (concluding that Establishment Clause plaintiffs "have more than an abstract interest" in their claims when they are "part of [the relevant community] and are directly affronted"). Nonetheless, we must guard against efforts to use this principle to derive standing from the bare fact of disagreement with a government policy, even passionate disagreement premised on Establishment Clause principles. Such disagreement, taken alone, is not sufficient to prove spiritual injury. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 486-87 & n.22 (1982) (holding that plaintiffs, who resided in Maryland and Virginia, lacked standing to challenge a property transfer in Pennsylvania, and rejecting the argument that "any person asserting an Establishment Clause violation possesses a 'spiritual stake' sufficient to confer standing").

With these principles in hand, we now address the standing of the plaintiffs, taking their circumstances separately, as they differ.

### A.   Ellen Tillett, her child, and the Foundation

The facts to support standing for Ellen Tillett and her child are notably thin. They had no personal exposure to the Spartanburg Bible School course apart from their abstract knowledge of the School District's released time policy. Moreover, they have alleged nothing to suggest that the policy or the Bible School course injured them in any way. Tillett's child never participated in the course and had not been pressured or encouraged to attend the course by anyone. Neither Tillett nor her child suffered any adverse repercussions from the child's decision not to enroll in the course. And the child's GPA was higher than that of any student in the child's class who took the Spartanburg Bible School course.

Moreover, Ellen Tillett did not receive the promotional letter from Spartanburg Bible School, as her child had not entered high school at the time the letter was sent. She was told about the letter by Heidi Moss, Robert Moss' wife, and only read it in preparation for this litigation. Tillett claims that after reading the letter, she found it to be "offensive" because it reflected "intolerance and narrow-mindedness . . . in what should be an open learning environment." Tillett testified that the School District's policy also made her child "feel like an outsider" at Spartanburg High School because it made him aware of the prevalence of intolerance in his community. Tillett has not suggested, however, that either she or her child altered conduct as a result of the released time policy.

Tillett's allegations amount to little more than simple disagreement with the wisdom of the School District's policy. Tillett and her child do not suggest that they were the targets or victims of this alleged religious intolerance—indeed, they are Christians. Thus they are seeking to vindicate, not their

own rights, but the rights of others. In these circumstances, we conclude that Tillett and her child lack standing to challenge the School District's released time policy. *See Barrows v. Jackson*, 346 U.S. 249, 255 (1953) ("Ordinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party").

Our conclusion that Tillett was not injured by the School District's policy requires the further conclusion that the Freedom From Religion Foundation also lacks standing. For an organization to have standing, it must establish that "at least one identified member had suffered or would suffer harm" from the defendant's conduct. *Summers*, 555 U.S. at 498; *see also Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) ("[A]n organization whose members are injured may represent those members in a proceeding for judicial review. But a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient" (citation omitted)). Because Tillett is a member of the Foundation and the Foundation has relied exclusively on her alleged injury to support its standing, its claim to standing rises or falls with Tillett. Thus, because Tillett lacks standing, so too does the Foundation.

## B.    The Mosses

Melissa Moss shares several similarities with Tillett's child. She, too, never took the Spartanburg Bible School course; she was never harassed for refusing to enroll; and she graduated with a higher GPA than any student in her class who had received a grade for the Spartanburg Bible School course. But other factors place both Melissa Moss and Robert Moss in a position different from Tillett and her child with respect to injury and standing.

First, Robert Moss did receive the promotional letter from Spartanburg Bible School describing its course of religious education. The letter described the course's Christian content

and stated that the course could be taken for elective credit at Spartanburg High School. Robert discussed the letter with Melissa, and both came to the view that it was part of a broader pattern of Christian favoritism on the part of Spartanburg High School and the School District.

Second, because the Mosses are not Christians, the School District's alleged Christian favoritism made them feel like "outsiders" in their own community. They claim that the letter suggested that the School District was endorsing Evangelical Christianity and disfavoring other religious traditions, including the Jewish tradition to which they belong. They claim that the Spartanburg Bible School course was merely one instance of a broader pattern of Christian favoritism by the School District, which they stated was evidenced by prayers and other Christian references by school-sponsored adults at school events. Feelings of marginalization and exclusion are cognizable forms of injury, particularly in the Establishment Clause context, because one of the core objectives of modern Establishment Clause jurisprudence has been to prevent the State from sending a message to non-adherents of a particular religion "that they are *outsiders*, not full members of the political community." *McCreary Cnty. v. ACLU*, 545 U.S. 844, 860 (2005) (emphasis added).

Finally, Robert and Melissa Moss testified that they changed their conduct in adverse ways as a result of their perceived outsider status. Robert became less involved as a volunteer parent at Spartanburg High School, and Melissa decided to go to a college outside of South Carolina because, in part, she felt excluded in her home community. For purposes of standing, these "change[s in] personal conduct on account of" allegedly unlawful conduct are indicative of injury. *Suhre*, 131 F.3d at 1087-88; *see also Friends of Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 184-85 (2000).

For these reasons, we conclude that Robert and Melissa Moss have standing to bring this action.

### III.   Establishment Clause

The Mosses concede that off-campus released time initiatives are generally constitutional, as allowed by *Zorach v. Clauson*, 343 U.S. 306 (1952); *see also Smith v. Smith*, 523 F.2d 121 (4th Cir. 1975). They contend, however, that the School District's released time program in this case is different from that approved in *Zorach* because it provides *academic credit* for released time coursework, whereas such credit was not part of the off-campus educational program approved in *Zorach*. As they assert, "this giving of academic credit is the centerpiece of this case." They argue that

> awarding academic credit advances religion more than does traditional released time. It alters the legal relationship between public school and student for religious reasons by giving a grade. It rewards a student for religious participation. It tells the world that the school approves of the student's mastery of religious precepts that have been taught. . . . [Spartanburg Bible School] students are not just getting an excused absence to pursue religious instruction; their religious life is being promoted and approved.

The School District contends that its released time policy is constitutional under the holdings of *Zorach* and *Smith*, and the fact that the School District gives credit for the released time course is, it argues, no different than the widely accepted practice of giving course credit to students who transfer from private religious schools to public schools. *See Lanner v. Wimmer*, 662 F.2d 1349, 1361 (10th Cir. 1981) (generally allowing school districts to grant academic credit to private school transfer students and public school released time students for their religious instruction). The School District argues that its policy "simply makes it possible to accommodate parents' and students' wish for released time education."

The First Amendment states that "Congress shall make no law respecting an establishment of religion," U.S. Const.

amend. I, and the Supreme Court has applied this principle against the states through the Fourteenth Amendment, *see Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947). To pass muster under the Establishment Clause, government conduct (1) must be driven in part by a *secular purpose*; (2) must have a *primary effect* that neither advances nor inhibits religion; and (3) must not *excessively entangle* church and State. *See Lemon*, 403 U.S. at 612-13. The Supreme Court has implemented these requirements, not through "a regime of total separation" between church and State, *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 760 (1973), but through a policy of "benevolent neutrality" that recognizes a wide range of "permissible state accommodation" for religion, *Walz v. Tax Comm'n*, 397 U.S. 664, 669, 673 (1970).

In the context of these principles, the Supreme Court has made clear that public schools have broad, but not unlimited, discretion to release students from their secular lessons so as to accommodate their desires to engage in religious instruction.

The Court first addressed released time religious education in *Illinois ex rel. McCollum v. Board of Education*, 333 U.S. 203 (1948), where it held unconstitutional an Illinois program that released students from secular coursework to receive religious lessons delivered by privately employed religious teachers *on public school grounds*. *Id.* at 205, 212. In explaining its conclusion, the Court emphasized that "the state's tax-supported public school buildings [were] used for the dissemination of religious doctrines" in the context of compulsory public education. *Id.* at 212.

A few years later, however, the Court considered and upheld a released time program that allowed students to pursue *off-campus* religious instruction at no cost to the public school system. *See Zorach v. Clauson*, 343 U.S. 306 (1952). The *Zorach* Court readily distinguished the program before it from the one it had struck down in *McCollum*, explaining that

New York City's public schools "do no more than accommodate their schedules to a program of outside religious instruction." *Id.* at 315. Because the school system displayed "no partiality to any one [religious] group" and because the lessons were conducted off-campus, the Court concluded that the New York City program "follows the best of our traditions" by "respect[ing] the religious nature of our people and accommodat[ing] the public service to their spiritual needs." *Id.* at 313-14.

We have since concluded that *Zorach* remains good law and held that an off-campus released time program satisfies all three requirements of the *Lemon* test. *See Smith*, 523 F.2d at 123-25. In *Smith*, we examined a Harrisonburg, Virginia program permitting public school students to attend religious courses held at trailers and churches in close proximity to public schools and applied the holding of *Zorach* in light of the post-*Zorach* framework set forth by the Supreme Court in *Lemon*. We determined (1) that the *purpose* of the program was secular in that "the schools aim[ed] only to accommodate the wishes of the students' parents"; (2) that the program resulted in no more *entanglement* than did the program at issue in *Zorach*; and (3) that the *primary effect* of the program was not the impermissible advancement or endorsement of religion, because the policy "is a largely passive and administratively wise response to a plenitude of parental assertions of the right to direct the upbringing and education of children under their control." *Id.* at 124-25 (internal quotation marks omitted).

The distinctions between the released time program before the Court in *McCollum*, on the one hand, and the programs at issue in *Zorach* and *Smith*, on the other, guide the proper disposition of this case. In *McCollum*, the public school brought religious instructors into the school to conduct classes in the school's classrooms, while students normally occupying those classrooms for secular courses went elsewhere, and the School District's superintendent approved and supervised

each of the religious instructors brought into the school. In invalidating the program, the Court noted that the State used "the State's tax-supported public school buildings" to "disseminat[e] religious doctrines" and employed "the state's compulsory public school machinery" to provide religious education to the students there. *McCollum*, 333 U.S. at 212.

By contrast, in *Zorach* and *Smith*, the public school permitted students to leave school grounds to receive religious instruction off campus and agreed to receive reports of the students' attendance at those classes. Under these circumstances, the Supreme Court and this court concluded that the public schools did "no more than accommodate their schedules to a program of outside religious instruction." *Zorach*, 343 U.S. at 315; *see also Smith*, 523 F.2d at 125. Indeed, the Court suggested that if public schools were not permitted to accommodate the religious desires of students and parents in this fashion, the result would be an unconstitutionally hostile environment toward religion. *Zorach*, 343 U.S. at 314; *see also Ehlers-Renzi v. Connelly Sch. of the Holy Child, Inc.*, 224 F.3d 283, 287 (4th Cir. 2000) (noting that the "authorized, and sometimes mandatory, accommodation of religion is a necessary aspect of the Establishment Clause jurisprudence because, without it, government would find itself effectively and unconstitutionally promoting the absence of religion over its practice").

Here, the School District's released time policy takes place off campus and expressly prohibits any use of public staff or funds for its execution. The circumstances before us are therefore far more similar to those in *Zorach* and *Smith* than those in *McCollum*.

The fact that a public school accepts credits for released time courses does not alter the analysis under any one of *Lemon*'s three prongs in view of the neutral administrative manner adopted by the School District for accepting those credits. The School District employed a model in which pri-

mary responsibility for evaluating released time courses lay with accredited private schools, not the public schools. Thus, under this model, an *unaccredited* entity, such as Spartanburg Bible School, could offer a released time course and assign grades to participating students for transfer to the public school system if it received a stamp of approval from an *accredited* private school. In this manner, the released time grades are handled much like the grades of a student who wishes to transfer from an accredited private school into a public school within the School District; the public school accepts the grades without individually assessing the quality or subject matter of the course, trusting the private school accreditation process to ensure adequate academic standards.

This model has enabled the School District to accommodate the desires of parents and students to participate in private religious education in Spartanburg County while avoiding the potential perils inherent in any governmental assessment of the "quality" of religious instruction. These perils were illustrated by *Lanner v. Wimmer*, 662 F.2d 1349 (10th Cir. 1981), where the court invalidated part of a released time program that awarded academic credit for some religious courses, but not for those which were found to be "mainly denominational." *Id.* at 1360-61. The court reasoned that the program constitutionally entangled church and State by requiring public school officials to apply a "religious test" to "examin[e] and monitor[ ] the [religious] content of courses." *Id.* at 1361. By contrast, the School District's policy in this case is not vulnerable to such concerns because it leaves the monitoring function to private schools.

Also important to our conclusion is the governing principle that private religious education is an integral part of the American school system. Indeed, States are constitutionally obligated to allow children and parents to choose whether to fulfill their compulsory education obligations by attending a secular public school or a religious private school. *See Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925). It would be

strange and unfair to penalize such students when they attempt to transfer into the public school system by refusing to honor the grades they earned in their religious courses, potentially preventing them from graduating on schedule with their public school peers. Far from establishing a state religion, the acceptance of transfer credits (including religious credits) by public schools sensibly *accommodates* the "genuine choice among options public and private, secular and religious." *Zelman v. Simmons-Harris*, 536 U.S. 639, 662 (2002) (upholding an Ohio voucher initiative for this reason).

Apart from the central issue of academic credit, the plaintiffs also contend that the School District otherwise became excessively entangled with the Spartanburg Bible School. In particular, they claim that the School District not only accommodated, but actively promoted, the Spartanburg Bible School course by allowing it to bring informational flyers to the guidance counselor's office; to host a table at the annual student registration fair; and to visit homerooms so as to solicit student participation. These arguments are unpersuasive in light of the record. School District officials carefully maintained a neutral relationship with the Spartanburg Bible School, neither encouraging nor discouraging student participation in the Bible School's course. Spartanburg Bible School did provide informational flyers to guidance counselors, but the flyers were kept behind the counselors' desks and distributed to parents and students only after the parents and students expressed an interest in the Spartanburg Bible School course. Furthermore, the School District's policy of allowing Spartanburg Bible School to attend an annual student registration fair was unremarkable, given that other nonreligious organizations, such as military and college recruiters, were accorded similar privileges. And finally, the record does not show that the School District allowed representatives of Spartanburg Bible School to visit homerooms in Spartanburg High School. A single homeroom visit did occur at one of the School District's junior high schools, but the record suggests

that the incident was not repeated, and in any event, such visits never occurred at Spartanburg High School.

At bottom, because the School District's released time policy relies exclusively on the provision of off-campus religious instruction by nongovernmental educators and passively accommodates the "genuine and independent choices" of parents and students to pursue such instruction, *Zelman*, 536 U.S. at 649, we affirm the district court's judgment.

IV

Pursuant to the Released Time Credit Act, which the South Carolina General Assembly enacted on its finding that "[t]he free exercise of religion is important to the intellectual, moral, civic, and ethical development of students in South Carolina," 2006 S.C. Acts 322, Spartanburg County School District Seven adopted a released time program which it administered in a religiously neutral manner. We see no evidence that the program has had the effect of establishing religion or that it has entangled the School District in religion. As was the General Assembly and School District's purpose, the program properly accommodates religion without establishing it, in accordance with the First Amendment.

*AFFIRMED*