AGEE, Circuit Judge,
with whom Judge NIEMEYER and Judge SHEDD join, dissenting:
In their haste to reach the merits of the plaintiffs’ Establishment Clause claim, my *660 colleagues in the majority neglect to follow the longstanding and well-defined requirements of Article III of the United States Constitution. They err, as did the district court, in holding that the plaintiffs had standing to bring an Establishment Clause claim. For that reason, I respectfully dissent from the majority’s decision to uphold the district court’s preliminary injunction. The plaintiffs do not have standing to bring the current action.[1]
I.
A.
Article III limits the federal judiciary’s authority to adjudicate only “cases” and “controversies.” U.S. Const, art. Ill, § 2. “[Standing is an integral component of the case or controversy requirement.” CGM, LLC v. BellSouth Telecomms., Inc., 664 F.3d 46, 52 (4th Cir. 2011); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2180, 119 L.Ed.2d 351 (1992) (“[T]he core component of standing is an essential and unchanging part of the case- or-controversy requirement of Article III.”).[2] A plaintiff must satisfy three elements to establish standing: (1) “the plaintiff must have suffered an injury in fact— an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical”; (2) “there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court”; and (3) “it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.” Defenders of Wildlife, 504 U.S. at 560-61, 112 S.Ct. 2130. “The party invoking federal jurisdiction bears the burden of establishing these elements.” Id. at 561, 112 S.Ct. 2130.
Due to the difficulty of determining injury in Establishment Clause cases, “rules of standing recognize that noneconomic or intangible injury may suffice to make an Establishment Clause claim justiciable.” Suhre v. Haywood Cty., 131 F.3d 1083, 1086 (4th Cir. 1997); see also Moss v. Spartanburg Cty. Sch. Dist. Seven, 683 F.3d 599, 605 (4th Cir. 2012) (“Many of the harms that Establishment Clause plaintiffs suffer are spiritual and value-laden, rather than tangible and economic.”). However, “a mere abstract objection to unconstitutional conduct is not sufficient to confer standing.” Suhre, 131 F.3d at 1086; see also Moss, 683 F.3d at 605 (“Nonetheless, we must guard against efforts to use this principle to derive standing from the bare fact of disagreement with a government policy, even passionate disagreement premised on Establishment Clause principles. Such disagreement, taken alone, is not sufficient to prove spiritual injury.”). For example, “a citizen of Omaha, Nebraska who finds a religious symbol in the Haywood County Courthouse [in North Carolina] to be offensive in the abstract would not have standing to challenge it. The injury to our hypothetical Omaha plaintiff partakes of a generalized grievance, based on nothing more than each citizen’s shared individuated right to a government that shall make no law respecting the establishment of religion.” Suhre, 131 F.3d at 1086; accord Defenders of Wildlife, 504 U.S. at 575, 112 S.Ct. 2130 (“[T]o entitle a private individu *661 al to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public.”). Conversely, “direct contact with an unwelcome religious exercise or display works a personal injury distinct from and in addition to each citizen’s general grievance against unconstitutional government conduct.” Suhre, 131 F.3d at 1086.
B.
The district court determined that three of the individual plaintiffs (Meteab, John Doe #1, and John Doe #3) had sufficiently pleaded that they had suffered stigmatization due to the Executive Order. See J.A. 780 (finding that the plaintiffs claimed “the anti-Muslim animus underlying the Second Executive Order inflicts stigmatizing injuries on them all” (emphasis added)). Because Section 2(c) also allegedly prevents the family members of these plaintiffs from entering the country, the district court held that they had asserted injuries sufficient to confer standing to pursue their Establishment Clause claim.
Doe #1 is a lawful permanent resident and “non-practicing Muslim[].” J.A. 213, 305. His wife, also a non-practicing Muslim and Iranian national, has applied for an immigrant visa. She is currently awaiting an embassy interview, a condition precedent to the determination of whether to grant a visa. See 22 C.F.R. § 42.62(b) (“Every alien executing an immigrant visa application must be interviewed by a consular officer who shall determine on the basis of the applicant’s representations and the visa application and other relevant documentation—(1) The proper immigrant classification, if any, of the visa applicant, and (2) The applicant’s eligibility to receive a visa.”). Doe #1 alleges that the Executive Order has caused him and his wife to experience “significant fear, anxiety and insecurity ... regarding their future.” J.A. 246. He argues that because he is afraid that he will not be allowed to reenter the United States if he travels to Iran, Section 2(c) “forces [him] to choose between [his] career and being with [his] wife.” J.A. 306. Doe #1 maintains that “the anti-Muslim views that are driving the Executive Order, as well as the Order itself, have caused [him] significant stress and anxiety.” J.A. 306. He is allegedly concerned for his safety.
Like Doe #1, Doe #3 is a lawful permanent resident, although nothing in the record indicates his religious preference.[3] In any event, Doe #3 applied for an immigrant visa on behalf of his wife, an Iranian national. In May 2016, the United States Embassy “informed [her] that her documentation was complete and she needed to wait for administrative processing, but that she should be able to join her husband in two to three months.” J.A. 246. With his wife in Iran, Doe #3 maintains that “[t]heir continued separation has placed extraordinary stress on John Doe #3 and his wife, and their relationship.” J.A. 247. He “feel[s] as though they’ve been unable to start their lives together because of the delays and uncertainty caused by the Executive Order.” J.A. 247. Doe #3 asserts that he and his wife “are being torn apart by this situation and the uncertainty and delay.” J.A. 310. He believes that the anti- *662 Muslim message of the Executive Order has caused him stress and anxiety and to feel like an outsider.
Meteab is also a lawful permanent resident and Muslim. His wife and children are here in the United States. However, Meteab has three brothers who wish to resettle in North America as refugees. Two of the three have received approval for resettlement in the United States but have not yet obtained travel documents. The remaining brother has been approved for resettlement in Canada. Meteab contends that, as a result of the Executive Order, he “and his wife have experienced anti-Muslim sentiment and felt very uncomfortable and insecure in their community, causing them acute mental stress.” J.A. 250. The couple “ha[s] experienced hostility in public, with people staring at Mr. Meteab’s wife, who wears a hijab, and refusing to stop for them at crosswalks.” J.A. 250.
C.
The district court held that, “where the [allegedly anti-Muslim] Executive Order was issued by the federal government, and the three Individual Plaintiffs have family members who are directly and adversely affected in that they are barred from entry to the United States as a result of the terms of the Executive Orders, these Individual Plaintiffs have alleged a personal injury as a consequence of the alleged Establishment Clause violation.” J.A. 787. However, as the record reflects, the district court clearly erred in finding that Meteab had standing to challenge Section 2(c) of the Executive Order. Meteab’s brothers are refugees, and Section 2(c) does not apply to refugees. The district court recognized in its opinion that “[t]he Plaintiffs’ Establishment Clause ... arguments focused primarily on the travel ban for citizens of the six Designated Countries in Section 2(c) of the Second Executive Order.” J.A. 809. The court elaborated that the plaintiffs had “not sufficiently developed] ... arguments relating to refugees] to warrant an injunction on those sections at this time.” J.A. 810. Therefore, Meteab cannot base standing to challenge Section 2(c) on any “prolonged separation” from his refugee brothers, who are covered by a different section of the Executive Order. See DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (“[A] plaintiff must demonstrate standing for each claim he seeks to press.”); Allen v. Wright, 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (“Typically, however, the standing inquiry requires careful judicial examination of a complaint’s allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.”), abrogated on other grounds by Lexmark Int’l, Inc. v. Static Control Components, Inc., 572 U.S. —, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014). Thus, Meteab can show Establishment Clause standing only if his alleged stigmatization is a cognizable injury for standing purposes.
As for Doe #3, his wife was granted a visa during the pendency of this appeal, so he, too, is left with only stigma to make his Establishment Clause claim of standing. For the reasons stated below, such a stigma claim alone is insufficient to confer standing under the record in this case.
Perhaps recognizing these deficits, the majority bases its affirmation of the district court’s standing determination only on Doe #1. But Doe #1 does not have standing either because the stigma that he alleges to have suffered and the potential denial of a visa to his wife are two distinct harms, neither of which meet basic standing requirements. Setting aside Doe #l’s allegation that he experienced stigmatiza *663 tion himself, the imagined future denial of a visa to his wife is simply too vague and speculative to meet the constitutional standard of a concrete and “actual or imminent, not conjectural or hypothetical” injury. Defenders of Wildlife, 504 U.S. at 560, 112 S.Ct. 2130. The majority’s conception of “injury-in-fact” by Doe #1 is conjectural and hypothetical; he had no reasonable expectation that his wife would join him in the United States at any particular time either prior to the drafting of the Executive Order or at any time during the suspension period.
1.
The plaintiffs’ pleadings show that their alleged injuries consist solely of their personal perception of stigmatization. In the complaint, they allege, “The March 6 Order also contains language that associates Muslims with violence, terrorism, bigotry, and hatred, inflicting stigmatie and dignitary harms.” J.A. 207 (emphasis added). Despite the majority’s holding, the stigma that plaintiffs claim to have suffered is not a cognizable injury because it is simply a subjective disagreement with a government action. To allow these plaintiffs to pursue their claims based on an idiosyncratic projection of stigmatization is to grant every would-be Establishment Clause plaintiff who develops negative feelings in response to some action by the Government a court proceeding in which to vent his subjective reactions as a legal claim. See Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 489, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (“Were we to accept respondents’ claim of standing in this case, there would be no principled basis for confining our exception to litigants relying on the Establishment Clause.”). Indeed, to find standing here is to find standing for not only all Muslims in America, but any American who may find the Executive Order (or any other Government action) personally disagreeable, which is “beyond all reason.” See Defenders of Wildlife, 504 U.S. at 566, 112 S.Ct. 2130.
The Supreme Court “ha[s] consistently held that a plaintiff raising only a generally available grievance about government— claiming only harm to his and every citizen’s interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.” Id. at 573-74, 112 S.Ct. 2130; accord Valley Forge, 454 U.S. at 482-83, 102 S.Ct. 752 (stating that the Supreme Court “repeatedly has rejected claims of standing predicated on the right, possessed by every citizen, to require that the Government be administered according to law”). The Court has rejected a generalized finding of standing based on “the need for an available plaintiff, without whom the Establishment Clause would be rendered virtually unenforceable by the judiciary.” Valley Forge, 454 U.S. at 470, 102 S.Ct. 752. The plaintiffs here “fail to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees.” Id. at 485, 102 S.Ct. 752. The majority does not provide any principled instruction on how its sweeping standing ruling is cabined to this particular case, and thus its holding far oversteps the bounds of traditional judicial authority. See id. at 471, 102 S.Ct. 752 (stating that Article III is a limitation on “judicial power”); see also Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (“The command to guard jealously and exercise rarely our power to make constitutional pronouncements requires strictest *664 adherence when matters of great national significance are at stake.”), abrogated on other grounds by Lexmark, 134 S.Ct. 1377; Defenders of Wildlife, 504 U.S. at 576, 112 S.Ct. 2130 (“Vindicating the public interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive.”).
The majority relies heavily on two Fourth Circuit cases, Suhre and Moss, but these cases are inapposite.[4] In Suhre, local officials displayed the Ten Commandments in the county courthouse where the plaintiff, a resident of the county, often visited. 131 F.3d at 1084-85. Suhre, an avowed atheist and serial litigant, took offense to the display and “aver[red] that contact with the display cause[d] him distress.” Id. at 1085. We ultimately found that Suhre had alleged a “cognizable injury caused by personal contact with a public religious' display.” Id. at 1090.
In Moss, a school district “adopted a policy allowing public school students to receive two academic credits for off-campus religious instruction offered by private educators.” 683 F.3d at 601. The plaintiffs, including two students and their parents, urged the Court to “adopt a per se rule that students and parents always have standing to bring suit against policies at their school when they allege a violation of the Establishment Clause, regardless of whether they allege or can prove personal injury.” Id. at 605. We rejected that argument and held that, although injuries in such cases are often intangible, plaintiffs must have been “spiritually affronted as a result of direct and unwelcome contact with an alleged religious establishment within their community.” Id. Because one student had no “personal exposure” to the policy other than mere awareness of its existence, we held that the student lacked standing, despite that student “feel[ing] like an outsider” in the school environment. Id. at 606. However, we found that the other student had standing to bring a claim because she actually received a solicitation letter from a religious institution that participated in the school’s program and “changed [her] conduct in adverse ways as a result of [her] perceived outsider status.” Id. at 607.
In both of these cases, local governments took direct actions in relation to their constituents in an immediate and concrete way. All residents who entered the courthouse in Suhre were personally exposed to the display of the Ten Commandments, while the academic policy in Moss was actually sent to the student. As a consequence, the plaintiffs in those cases did come into direct contact with the alleged Establishment Clause violations.[5]
In contrast, the Executive Order here applies only to prospective immigrants. The order’s focus faces outward towards the alien residents of the subject countries, not inward towards persons in the United States like the plaintiffs. That circumstance is in direct distinction to the reli *665 gious display in Suhre or the academic policy in Moss. Section 2(c) of the facially-neutral Executive Order applies only to “nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen.” Section 3(b)(i) explicitly exempts “any lawful permanent resident of the United States,” like the plaintiffs, from the travel suspension, thus not applying to Does #1 and #3 and Meteab. The majority posits that, because the policy at issue came from the President himself that somehow metamorphosizes into the “direct contact” Suhre requires. Majority Op. 585-86. This distorts the standing inquiry as the source of the directive is irrelevant. What matters is whether the plaintiff came into direct contact with the religious establishment. And that is not the case here simply because the President is the party signing an order.
Despite the majority’s giving short shrift to In re Navy Chaplaincy, 534 F.3d 756 (D.C. Cir. 2008), the case is directly on point. There, “[a] group of Protestant Navy chaplains sued the Navy, alleging that the Navy’s operation of its retirement system discriminates in favor of Catholic chaplains in violation of the Establishment Clause.” Id. at 758.[6] The plaintiffs “conceded that the Navy did not deny them any benefits or opportunities on account of their religion.” Id. at 760. Rather, they maintained “that other chaplains suffered such discrimination.” Id. The plaintiffs contended that they had standing because “they ha[d] been subjected to the Navy’s message of religious preference as a result of the Navy’s running a retirement system that favors Catholic chaplains.” Id. The D.C. Circuit rejected this argument and found that they did not “have standing based on their exposure to the Navy’s alleged message of religious preference.” Id. at 761. Like the Protestant Navy chaplains, the plaintiffs here claim offense to a message directed at others, who happen to be nationals of other countries. The plaintiffs’ claims of stress or stigmatization are subjective reactions, not direct contact with the Executive Order, and amount to disagreements with a government policy. See Moss, 683 F.3d at 604-05. As a result, the plaintiffs’ claim of injury by way of stigma is a general grievance, insufficient to confer standing. Suhre, 131 F.3d at 1086.[7]
2.
Perhaps recognizing the problems posed by basing standing only on the subjective feelings of the plaintiffs, the majority also holds that the alleged stigma suffered by Doe #1, combined with prolonged separation from his wife, is enough to support standing, thereby creating a kind of “stigma plus” standard.[8] However, the majori *666 ty’s construct erroneously conflates Doe #l’s Establishment Clause standing claim with his claim under the Immigration and Nationality Act (“INA”), which the Supreme Court has prohibited. See DaimlerChrysler Corp., 547 U.S. at 352, 126 S.Ct. 1854 (“[O]ur standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press.”). Plaintiffs are required to “demonstrate standing separately for each form of relief sought.” Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (emphasis added). The majority haphazardly merges alleged injuries unique to two different claims, and personal to different people, to manufacture standing.[9]
The majority reasons that Doe #1 has third-party standing to bring an Establishment Clause claim. Not so. Plaintiffs do not have standing to allege violations of the Establishment Clause on behalf of their immigrant relatives. See Whitmore v. Arkansas, 495 U.S. 149, 161 n.2, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (restating the general rule “that a litigant must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties”); cf. Defenders of Wildlife, 504 U.S. at 562, 112 S.Ct. 2130 (“[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.”). The relatives, in turn, do not have rights of entry or any Establishment Clause rights. Kerry v. Din, 576 U.S. —, 135 S.Ct. 2128, 2131, 192 L.Ed.2d 183 (2015) (“But because Berashk is an unadmitted and nonresident alien, he has no right of entry into the United States, and no cause of action to press in furtherance of his claim for admission.”); United States v. Verdugo-Urquidez, 494 U.S. 259, 265, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (suggesting that “the people protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be *667 considered part of that community”). Doe #1 is “seeking to vindicate, not [his] own rights, but the rights of others.” Moss, 683 F.3d at 606.
Doe #1 has no right to, or even a reasonable expectation of, a time certain meeting with his wife in America. His alleged injury is based on a mere conjecture that his wife will have her embassy interview and obtain a discretionary visa within the ninety-day suspension period of the Executive Order when the State Department has cautioned, well before the Executive Order, that it may take an indefinite period to schedule interviews much less adjudicate visa applications. See The Immigrant Visa Process: Interview, supra note 9 (stating that, although “[m]ost appointments are set within 60 days of [the National Visa Center’s] receipt of all requested documentation^] ... we cannot predict when an interview appointment will be available,” and warning that “[t]here may be a wait of several months for an interview date to become available” (emphasis added)). Any effect of the Executive Order on that speculative possibility is simply not determinable and thus fails to meet the constitutional standard of an injury “actual or imminent, not conjectural or hypothetical.” Defenders of Wildlife, 504 U.S. at 560, 112 S.Ct. 2130.
The majority underscores the fragility of its standing hypotheses when it avers, without any citation to precedent or evidence, that the Executive Order creates harm to the plaintiffs because “dedicating time and resources to a global review process[, for which Section 2(c) was designed to facilitate,] will further slow the adjudication of pending [visa] applications.” Majority Op. 584. Nothing in the record supports this assertion or ties any nexus to Doe #1 or his spouse. Doe #1 simply fails to carry his burden as to standing under the standard required by the Supreme Court. No constitutionally cognizable “harm” which is “certainly impending” to Doe #1 or to him via his spouse has been proffered. Defenders of Wildlife, 504 U.S. at 564 n.2, 112 S.Ct. 2130.[10]
For all these reasons, Doe #1 has no “legally protected interest,” Defenders of Wildlife, 504 U.S. at 560, 112 S.Ct. 2130, and no standing to pursue his Establishment Clause claim.[11]
II.
As the plaintiffs lack standing to pursue their cause of action, I respectfully dissent and would vacate the grant of a preliminary injunction by the district court.

. I join the well-written dissents of Judge Niemeyer and Judge Shedd in full. But, for the reasons stated herein, I would find it unnecessary to reach the merits of the plaintiffs' Establishment Clause claim.

. I have omitted internal alterations, citations, and quotation marks here and throughout this dissent, unless otherwise noted.

. The pleadings make only one religious reference with respect to Doe #3: "The anti-Muslim attitudes that are driving this Executive Order have caused me stress and anxiety and made me question whether I even belong in this country despite everything I have sacrificed and invested in making a life here.” J.A. 310.

. Suhre is a religious display case, a type of Establishment Clause claim that arguably belongs in its own category. See 131 F.3d at 1086 ("Religious display cases are an even more particularized subclass of Establishment Clause standing jurisprudence.”).

. The out-of-circuit cases on which the majority also relies are likewise inapposite for the same reasons that distinguish Suhre and Moss. See Awad v. Ziriax, 670 F.3d 1111, 1116, 1122 (10th Cir. 2012) (analyzing a "proposed constitutional amendment that would prevent Oklahoma state courts from considering or using Sharia law”); Catholic League for Religious and Civil Rights v. City and Cty. of San Francisco, 624 F.3d 1043, 1048-53 (9th Cir. 2010) (reviewing standing in a case challenging a city resolution that ordered Catholics in San Francisco to cease discriminating against same-sex couples).

. It is irrelevant that In re Navy Chaplaincy is a favoritism case as opposed to a condemnation case as alleged here, as they are two sides of the same Establishment Clause coin.

. Some of the plaintiffs, including Doe #1, have expressed fear that they will be denied reentry into the country if they travel to the subject countries to visit their family while the Executive Order is in effect. This fear is unfounded and contradicted by the plain terms of the Executive Order. Does #1 and 3 and Meteab are all lawful permanent residents. Section 3(b)(i) of the Executive Order exempts "any lawful permanent resident of the United States” from the temporary suspension of entry.

. In its attempt to distinguish In re Navy Chaplaincy, the majority implicitly holds that stigma alone is not enough to support standing. The majority states that, "contrary to the Government’s assertion, all Muslims in the United States do not have standing to bring this suit. Only those persons who suffer direct, cognizable injuries as a result of EO-2 have standing to challenge it.” Majority Op. 586 n.11. The majority avers that Doe #1 "is feeling the direct, painful effects of the Second Executive Order—both its. alleged mes *666 sage of religious condemnation and the prolonged separation it causes between him and his wife—in his everyday life.” Id. at 585. The majority is right in that regard—stigma is not enough.

. Although not the focus of this dissent, I also would find that Doe #1 does not have standing to bring an INA claim; he lacks a concrete injury. It is pure speculation whether Doe #l’s wife will receive a visa. Doe #1 has presented no evidence showing that his wife is likely to receive a visa, much less when, but for the operation of the executive order. Or that the executive order would tangibly affect the processing of her application in any way. See Opening Br. 19-20 ("Likewise, Doe #l's wife did not have her visa interview scheduled before the Revoked Order took effect, and had already been waiting roughly six weeks, making it similarly speculative whether the 90-day pause will affect her.”); see also The Immigrant Visa Process: Interview, U.S. Dep't of State, https://travel.state.gov/conten1/ visas/en/immigrate/immigrant-process/ interview.html (last visited May 23, 2017) (saved as ECF opinion attachment) (stating that, although "[m]ost appointments are set within 60 days of [the National Visa Center's] receipt of all requested documentation!,] • • • we cannot predict when an inteiview appointment will be available," and warning that "[tjhere may be a wait of several months for an interview date to become available” (emphasis added)). Nor has the Government denied the visa application of Doe #l's spouse.
Any injury caused by the Executive Order is not redressable because an injunction will not establish that Doe #l’s wife will receive a visa, as exemplified by her current status. See The Immigrant Visa Process: Interview, supra ("Based on U.S. law, not everyone who applies for a visa will be found eligible to come to the United States.”). Doe #1 does not have standing under the INA.

. Similarly, there is no feasible way to determine, except by pure speculation, how or whether the Executive Order’s visa waiver process might affect a particular visa application. Nothing in the record supports the majority’s conclusion that pursuing a waiver would affect any plaintiff. Rather, the majority has arbitrarily substituted its conjecture for evidence. The visa waiver process could just as likely allow Doe #l’s wife to obtain her visa as not during the temporary suspension period.

. The district court did not determine whether other individual plaintiffs or the organizational plaintiffs have standing to bring the Establishment Clause claim. That would be a matter to be considered by the district court in the first instance in any further proceedings.