# SUPREME COURT OF THE UNITED STATES

————————

Nos. 16–1436 (16A1190) and 16–1540 (16A1191)

————————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.

No. 16–1436 (16A1190)          *v.*

### INTERNATIONAL REFUGEE ASSISTANCE PROJECT, ET AL.

ON APPLICATION FOR STAY AND PETITION FOR WRIT OF
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE FOURTH CIRCUIT

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.

No. 16–1540 (16A1191)          *v.*

### HAWAII, ET AL.

ON APPLICATION FOR STAY AND PETITION FOR WRIT OF
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE NINTH CIRCUIT

[June 26, 2017]

PER CURIAM.

These cases involve challenges to Executive Order No. 13780, Protecting the Nation From Foreign Terrorist Entry Into the United States. The order alters practices concerning the entry of foreign nationals into the United States by, among other things, suspending entry of nationals from six designated countries for 90 days. Respondents challenged the order in two separate lawsuits. They obtained preliminary injunctions barring enforcement of several of its provisions, including the 90-day suspension of entry. The injunctions were upheld in large measure by the Courts of Appeals.

The Government filed separate petitions for certiorari, as well as applications to stay the preliminary injunctions

entered by the lower courts.  We grant the petitions for certiorari and grant the stay applications in part.

## I
## A

On January 27, 2017, President Donald J. Trump signed Executive Order No. 13769, Protecting the Nation From Foreign Terrorist Entry Into the United States.  82 Fed. Reg. 8977 (EO–1).  EO–1 addressed policies and procedures relating to the entry of foreign nationals into this country.  Among other directives, the order suspended entry of foreign nationals from seven countries identified as presenting heightened terrorism risks—Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen—for 90 days. §3(c).  Executive officials were instructed to review the adequacy of current practices relating to visa adjudications during this 90-day period.  §3(a).  EO–1 also modified refugee policy, suspending the United States Refugee Admissions Program (USRAP) for 120 days and reducing the number of refugees eligible to be admitted to the United States during fiscal year 2017.  §§5(a), (d).

EO–1 was immediately challenged in court.  Just a week after the order was issued, a Federal District Court entered a nationwide temporary restraining order enjoining enforcement of several of its key provisions.  *Washington* v. *Trump*, 2017 WL 462040 (WD Wash., Feb. 3, 2017).  Six days later, the Court of Appeals for the Ninth Circuit denied the Government's emergency motion to stay the order pending appeal.  *Washington* v. *Trump*, 847 F. 3d 1151 (2017).  Rather than continue to litigate EO–1, the Government announced that it would revoke the order and issue a new one.

A second order followed on March 6, 2017.  See Protecting the Nation From Foreign Terrorist Entry Into the United States, Exec. Order No. 13780, 82 Fed. Reg. 13209 (EO–2).  EO–2 describes "conditions in six of the . . . coun-

tries" as to which EO–1 had suspended entry, stating that these conditions "demonstrate [that] nationals [of those countries] continue to present heightened risks to the security of the United States," §1(e), and that "some of those who have entered the United States through our immigration system have proved to be threats to our national security," §1(h).

Having identified these concerns, EO–2 sets out a series of directives patterned on those found in EO–1. Several are relevant here. First, EO–2 directs the Secretary of Homeland Security to conduct a global review to determine whether foreign governments provide adequate information about nationals applying for United States visas. §2(a). EO–2 directs the Secretary to report his findings to the President within 20 days of the order's "effective date," after which time those nations identified as deficient will be given 50 days to alter their practices. §§2(b), (d)–(e).

Second, EO–2 directs that entry of nationals from six of the seven countries designated in EO–1—Iran, Libya, Somalia, Sudan, Syria, and Yemen—be "suspended for 90 days from the effective date" of the order. §2(c). EO–2 explains that this pause is necessary to ensure that dangerous individuals do not enter the United States while the Executive is working to establish "adequate standards . . . to prevent infiltration by foreign terrorists"; in addition, suspending entry will "temporarily reduce investigative burdens on agencies" during the Secretary's 20-day review. *Ibid.* A separate section provides for case-by-case waivers of the entry bar. §3(c).

Third, EO–2 suspends "decisions on applications for refugee status" and "travel of refugees into the United States under the USRAP" for 120 days following its effective date. §6(a). During that period, the Secretary of State is instructed to review the adequacy of USRAP application and adjudication procedures and implement

whatever additional procedures are necessary "to ensure that individuals seeking admission as refugees do not pose a threat" to national security. *Ibid.*

Fourth, citing the President's determination that "the entry of more than 50,000 refugees in fiscal year 2017 would be detrimental to the interests of the United States," EO–2 "suspend[s] any entries in excess of that number" for this fiscal year. §6(b).

Finally, §14 of EO–2 establishes the order's effective date: March 16, 2017.

## B

Respondents in these cases filed separate lawsuits challenging EO–2. As relevant, they argued that the order violates the Establishment Clause of the First Amendment because it was motivated not by concerns pertaining to national security, but by animus toward Islam. They further argued that EO–2 does not comply with certain provisions in the Immigration and Nationality Act (INA), 66 Stat. 187, as amended.

In No. 16–1436, a Federal District Court concluded that respondents were likely to succeed on their Establishment Clause claim with respect to §2(c) of EO–2—the provision temporarily suspending entry from six countries—and entered a nationwide preliminary injunction barring the Government from enforcing §2(c) against any foreign national seeking entry to the United States. *International Refugee Assistance Project* v. *Trump*, ___ F. Supp. 3d ___, 2017 WL 1018235 (D Md., Mar. 16, 2017) (*IRAP*). The District Court in No. 16–1540—likewise relying on the Establishment Clause—entered a broader preliminary injunction: The court enjoined nationwide enforcement of all of §§2 and 6. *Hawaii* v. *Trump*, ___ F. Supp. 3d ___, 2017 WL 1167383 (D Haw., Mar. 29, 2017) (entering preliminary injunction); ___ F. Supp. 3d ___, 2017 WL 1011673 (D Haw., Mar. 15, 2017) (entering temporary

restraining order). In addition to the §2(c) suspension of entry, this injunction covered the §6(a) suspension of refugee admissions, the §6(b) reduction in the refugee cap, and the provisions in §§2 and 6 pertaining only to internal executive review.

These orders, entered before EO–2 went into effect, prevented the Government from initiating enforcement of the challenged provisions. The Government filed appeals in both cases.

The Court of Appeals for the Fourth Circuit ruled first. On May 25, over three dissenting votes, the en banc court issued a decision in *IRAP* that largely upheld the order enjoining enforcement of §2(c). 857 F. 3d 554. The majority determined that respondent John Doe #1, a lawful permanent resident whose Iranian wife is seeking entry to the United States, was likely to succeed on the merits of his Establishment Clause claim. The majority concluded that the primary purpose of §2(c) was religious, in violation of the First Amendment: A reasonable observer familiar with all the circumstances—including the predominantly Muslim character of the designated countries and statements made by President Trump during his Presidential campaign—would conclude that §2(c) was motivated principally by a desire to exclude Muslims from the United States, not by considerations relating to national security. Having reached this conclusion, the court upheld the preliminary injunction prohibiting enforcement of §2(c) against any foreign national seeking to enter this country.

On June 1, the Government filed a petition for certiorari seeking review of the Fourth Circuit's decision. It also filed applications seeking stays of both injunctions, including the *Hawaii* injunction still pending before the Ninth Circuit. In addition, the Government requested that this Court expedite the certiorari stage briefing. We accordingly directed respondents to file responses to the stay appli-

cations by June 12 and respondents in *IRAP* to file a brief in opposition to the Government's petition for certiorari by the same day.

Respondents' June 12 filings injected a new issue into the cases. In *IRAP*, respondents argued that the suspension of entry in §2(c) would expire on June 14. Section 2(c), they reasoned, directs that entry "be suspended for 90 days from the effective date of" EO–2. The "effective date" of EO–2 was March 16. §14. Although courts had enjoined portions of EO–2, they had not altered its effective date, nor so much as mentioned §14. Thus, even though it had never been enforced, the entry suspension would expire 90 days from March 16: June 14. At that time, the dispute over §2(c) would become moot. Brief in Opposition 13–14.

On the same day respondents filed, the Ninth Circuit ruled in *Hawaii*. ___ F. 3d ___, 2017 WL 2529640 (June 12, 2017) (*per curiam*). A unanimous panel held in favor of respondents the State of Hawaii and Dr. Ismail Elshikh, an American citizen and imam whose Syrian mother-in-law is seeking entry to this country. Rather than rely on the constitutional grounds supporting the District Court's decision, the court held that portions of EO–2 likely exceeded the President's authority under the INA. On that basis it upheld the injunction as to the §2(c) entry suspension, the §6(a) suspension of refugee admissions, and the §6(b) refugee cap. The Ninth Circuit, like the Fourth Circuit, concluded that the injunction should bar enforcement of these provisions across the board, because they would violate the INA "in all applications." *Id.*, at *28. The court did, however, narrow the injunction so that it would not bar the Government from undertaking the internal executive reviews directed by EO–2.

We granted the parties' requests for supplemental briefing addressed to the decision of the Ninth Circuit. Before those briefs were filed, however, the ground shifted again.

Per Curiam

On June 14, evidently in response to the argument that §2(c) was about to expire, President Trump issued a memorandum to Executive Branch officials. The memorandum declared the effective date of each enjoined provision of EO–2 to be the date on which the injunctions in these cases "are lifted or stayed with respect to that provision." Presidential Memorandum for the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence (June 14, 2017). The memorandum further provided that, to the extent necessary, it "should be construed to amend the Executive Order." *Ibid.* The Government takes the view that, if any mootness problem existed previously, the President's memorandum has cured it.

The parties have since completed briefing, with the Government requesting that we construe its supplemental brief in *Hawaii* as a petition for certiorari. There is no objection from respondents, and we do so. Both petitions for certiorari and both stay applications are accordingly ripe for consideration.

II

The Government seeks review on several issues. In *IRAP*, the Government argues that respondent Doe lacks standing to challenge §2(c).* The Government also contends that Doe's Establishment Clause claim fails on the merits. In its view, the Fourth Circuit should not have asked whether §2(c) has a primarily religious purpose. The court instead should have upheld EO–2 because it rests on the "facially legitimate and bona fide" justification of protecting national security. *Kleindienst* v. *Mandel*, 408

—————

*On June 24, 2017, this Court received a letter from counsel for Doe advising that Doe's wife received an immigrant visa on or about June 22, 2017. The parties may address the significance of that development at the merits stage. It does not affect our analysis of the stay issues in these cases.

U. S. 753, 770 (1972).   In addition, the Fourth Circuit
erred by focusing on the President's campaign-trail com-
ments to conclude that §2(c)—religiously neutral on its
face—nonetheless has a principally religious purpose.   At
the very least, the Government argues, the injunction is
too broad.

In *Hawaii*, the Government likewise argues that re-
spondents Hawaii and Dr. Elshikh lack standing and that
(at a minimum) the injunction should be narrowed.   The
Government's principal merits contention pertains to a
statutory provision authorizing the President to "suspend
the entry of all aliens or any class of aliens" to this country
"[w]henever [he] finds that the entry of any aliens or of
any class of aliens . . . would be detrimental to the inter-
ests of the United States."   8 U. S. C. §1182(f ).   The Ninth
Circuit held that "[t]here is no sufficient finding in [EO–2]
that the entry of the excluded classes would be detri-
mental to the interests of the United States."   *Hawaii*,
2017 WL 2529640, at \*14.   This, the Government argues,
constitutes impermissible judicial second-guessing of the
President's judgment on a matter of national security.

In addition to seeking certiorari, the Government asks
the Court to stay the injunctions entered below, thereby
permitting the enjoined provisions to take effect.   Accord-
ing to the Government, it is likely to suffer irreparable
harm unless a stay issues.   Focusing mostly on §2(c), and
pointing to the descriptions of conditions in the six desig-
nated nations, the Government argues that a 90-day
pause on entry is necessary to prevent potentially danger-
ous individuals from entering the United States while the
Executive reviews the adequacy of information provided
by foreign governments in connection with visa adjudica-
tions.   Additionally, the Government asserts, the tempo-
rary bar is needed to reduce the Executive's investigative
burdens while this review proceeds.

Per Curiam

A

To begin, we grant both of the Government's petitions for certiorari and consolidate the cases for argument. The Clerk is directed to set a briefing schedule that will permit the cases to be heard during the first session of October Term 2017. (The Government has not requested that we expedite consideration of the merits to a greater extent.) In addition to the issues identified in the petitions, the parties are directed to address the following question: "Whether the challenges to §2(c) became moot on June 14, 2017."

B

We now turn to the preliminary injunctions barring enforcement of the §2(c) entry suspension. We grant the Government's applications to stay the injunctions, to the extent the injunctions prevent enforcement of §2(c) with respect to foreign nationals who lack any bona fide relationship with a person or entity in the United States. We leave the injunctions entered by the lower courts in place with respect to respondents and those similarly situated, as specified in this opinion. See *infra,* at 11–12.

Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents. See *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 20, 24 (2008); 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2948 (3d ed. 2013). The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, *University of Tex.* v. *Camenisch*, 451 U. S. 390, 395 (1981), but to balance the equities as the litigation moves forward. In awarding a preliminary injunction a court must also "conside[r] . . . the overall public interest." *Winter*, *supra*, at 26. In the course of doing so, a court "need not grant the total relief sought by the applicant but may mold its

decree to meet the exigencies of the particular case." Wright, *supra*, §2947, at 115.

Here, of course, we are not asked to grant a preliminary injunction, but to stay one. In assessing the lower courts' exercise of equitable discretion, we bring to bear an equitable judgment of our own. *Nken* v. *Holder*, 556 U. S. 418, 433 (2009). Before issuing a stay, "[i]t is ultimately necessary . . . to balance the equities—to explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes* v. *E-Systems, Inc. Group Hospital Medical & Surgical Ins. Plan*, 501 U. S. 1301, 1305 (1991) (Scalia, J., in chambers) (internal quotation marks omitted). This Court may, in its discretion, tailor a stay so that it operates with respect to only "some portion of the proceeding." *Nken*, *supra*, at 428.

The courts below took account of the equities in fashioning interim relief, focusing specifically on the concrete burdens that would fall on Doe, Dr. Elshikh, and Hawaii if §2(c) were enforced. They reasoned that §2(c) would "directly affec[t]" Doe and Dr. Elshikh by delaying entry of their family members to the United States. *IRAP*, 857 F. 3d, at 585, n. 11; see *Hawaii*, 2017 WL 2529640, at *7–*8, *24. The Ninth Circuit concluded that §2(c) would harm the State by preventing students from the designated nations who had been admitted to the University of Hawaii from entering this country. These hardships, the courts reasoned, were sufficiently weighty and immediate to outweigh the Government's interest in enforcing §2(c). Having adopted this view of the equities, the courts approved injunctions that covered not just respondents, but parties similarly situated to them—that is, people or entities in the United States who have relationships with foreign nationals abroad, and whose rights might be affected if those foreign nationals were excluded. See *Mandel*, 408 U. S., at 763–765 (permitting American plaintiffs to challenge the exclusion of a foreign national on the

ground that the exclusion violated their own First Amendment rights).

But the injunctions reach much further than that: They also bar enforcement of §2(c) against foreign nationals abroad who have no connection to the United States at all. The equities relied on by the lower courts do not balance the same way in that context. Denying entry to such a foreign national does not burden any American party by reason of that party's relationship with the foreign national. And the courts below did not conclude that exclusion in such circumstances would impose any legally relevant hardship on the foreign national himself. See *id.*, at 762 ("[A]n unadmitted and nonresident alien . . . ha[s] no constitutional right of entry to this country"). So whatever burdens may result from enforcement of §2(c) against a foreign national who lacks any connection to this country, they are, at a minimum, a good deal less concrete than the hardships identified by the courts below.

At the same time, the Government's interest in enforcing §2(c), and the Executive's authority to do so, are undoubtedly at their peak when there is no tie between the foreign national and the United States. Indeed, EO–2 itself distinguishes between foreign nationals who have some connection to this country, and foreign nationals who do not, by establishing a case-by-case waiver system primarily for the benefit of individuals in the former category. See, *e.g.*, §§3(c)(i)–(vi). The interest in preserving national security is "an urgent objective of the highest order." *Holder* v. *Humanitarian Law Project*, 561 U. S. 1, 28 (2010). To prevent the Government from pursuing that objective by enforcing §2(c) against foreign nationals unconnected to the United States would appreciably injure its interests, without alleviating obvious hardship to anyone else.

We accordingly grant the Government's stay applications in part and narrow the scope of the injunctions as to

§2(c). The injunctions remain in place only with respect to parties similarly situated to Doe, Dr. Elshikh, and Hawaii. In practical terms, this means that §2(c) may not be enforced against foreign nationals who have a credible claim of a bona fide relationship with a person or entity in the United States. All other foreign nationals are subject to the provisions of EO–2.

The facts of these cases illustrate the sort of relationship that qualifies. For individuals, a close familial relationship is required. A foreign national who wishes to enter the United States to live with or visit a family member, like Doe's wife or Dr. Elshikh's mother-in-law, clearly has such a relationship. As for entities, the relationship must be formal, documented, and formed in the ordinary course, rather than for the purpose of evading EO–2. The students from the designated countries who have been admitted to the University of Hawaii have such a relationship with an American entity. So too would a worker who accepted an offer of employment from an American company or a lecturer invited to address an American audience. Not so someone who enters into a relationship simply to avoid §2(c): For example, a nonprofit group devoted to immigration issues may not contact foreign nationals from the designated countries, add them to client lists, and then secure their entry by claiming injury from their exclusion.

In light of the June 12 decision of the Ninth Circuit vacating the injunction as to §2(a), the executive review directed by that subsection may proceed promptly, if it is not already underway. EO–2 instructs the Secretary of Homeland Security to complete this review within 20 days, after which time foreign governments will be given 50 days further to bring their practices into line with the Secretary's directives. §§2(a)–(b), (d). Given the Government's representations in this litigation concerning the resources required to complete the 20-day review, we fully expect that the relief we grant today will permit the Exec-

utive to conclude its internal work and provide adequate notice to foreign governments within the 90-day life of §2(c).

## C

The *Hawaii* injunction extends beyond §2(c) to bar enforcement of the §6(a) suspension of refugee admissions and the §6(b) refugee cap. In our view, the equitable balance struck above applies in this context as well. An American individual or entity that has a bona fide relationship with a particular person seeking to enter the country as a refugee can legitimately claim concrete hardship if that person is excluded. As to these individuals and entities, we do not disturb the injunction. But when it comes to refugees who lack any such connection to the United States, for the reasons we have set out, the balance tips in favor of the Government's compelling need to provide for the Nation's security. See *supra,* at 9–11; *Haig* v. *Agee*, 453 U. S. 280, 307 (1981).

The Government's application to stay the injunction with respect to §§6(a) and (b) is accordingly granted in part. Section 6(a) may not be enforced against an individual seeking admission as a refugee who can credibly claim a bona fide relationship with a person or entity in the United States. Nor may §6(b); that is, such a person may not be excluded pursuant to §6(b), even if the 50,000-person cap has been reached or exceeded. As applied to all other individuals, the provisions may take effect.

\*  \*  \*

Accordingly, the petitions for certiorari are granted, and the stay applications are granted in part.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 16–1436 (16A1190) and 16–1540 (16A1191)

_____

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.
No. 16–1436 (16A1190)          *v.*
## INTERNATIONAL REFUGEE ASSISTANCE PROJECT, ET AL.

ON APPLICATION FOR STAY AND PETITION FOR WRIT OF
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE FOURTH CIRCUIT

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.
No. 16–1540 (16A1191)          *v.*
## HAWAII, ET AL.

ON APPLICATION FOR STAY AND PETITION FOR WRIT OF
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE NINTH CIRCUIT

[June 26, 2017]

JUSTICE THOMAS, with whom JUSTICE ALITO and JUSTICE GORSUCH join, concurring in part and dissenting in part.

I agree with the Court that the preliminary injunctions entered in these cases should be stayed, although I would stay them in full. The decision whether to stay the injunctions is committed to our discretion, *ante*, at 9–10, but our discretion must be "guided by sound legal principles," *Nken* v. *Holder*, 556 U. S. 418, 434 (2009) (internal quotation marks omitted). The two "most critical" factors we must consider in deciding whether to grant a stay are "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits" and "(2) whether the applicant will be irreparably injured

absent a stay." *Ibid.* (internal quotation marks omitted). Where a party seeks a stay pending certiorari, as here, the applicant satisfies the first factor only if it can show both "a reasonable probability that certiorari will be granted" and "a significant possibility that the judgment below will be reversed." *Barnes* v. *E-Systems, Inc. Group Hospital Medical & Surgical Ins. Plan*, 501 U. S. 1301, 1302 (1991) (Scalia, J., in chambers). When we determine that those critical factors are satisfied, we must "balance the equities" by "explor[ing] the relative harms to applicant and respondent, as well as the interests of the public at large." *Id.*, at 1304–1305 (internal quotation marks omitted); cf. *Nken*, *supra*, at 435 (noting that the factors of "assessing the harm to the opposing party and weighing the public interest" "merge when the Government is the opposing party").

The Government has satisfied the standard for issuing a stay pending certiorari. We have, of course, decided to grant certiorari. See *ante*, at 8–9. And I agree with the Court's implicit conclusion that the Government has made a strong showing that it is likely to succeed on the merits—that is, that the judgments below will be reversed. The Government has also established that failure to stay the injunctions will cause irreparable harm by interfering with its "compelling need to provide for the Nation's security." *Ante*, at 13. Finally, weighing the Government's interest in preserving national security against the hardships caused to respondents by temporary denials of entry into the country, the balance of the equities favors the Government. I would thus grant the Government's applications for a stay in their entirety.

Reasonable minds may disagree on where the balance of equities lies as between the Government and respondents in these cases. It would have been reasonable, perhaps, for the Court to have left the injunctions in place only as to respondents themselves. But the Court takes the addi-

tional step of keeping the injunctions in place with regard to an unidentified, unnamed group of foreign nationals abroad. No class has been certified, and neither party asks for the scope of relief that the Court today provides. "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*" in the case, *Califano* v. *Yamasaki*, 442 U. S. 682, 702 (1979) (emphasis added), because a court's role is "to provide relief" only "to claimants . . . who have suffered, or will imminently suffer, actual harm." *Lewis* v. *Casey*, 518 U. S. 343, 349 (1996). In contrast, it is the role of the "political branches" to "shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Ibid.*

Moreover, I fear that the Court's remedy will prove unworkable. Today's compromise will burden executive officials with the task of deciding—on peril of contempt— whether individuals from the six affected nations who wish to enter the United States have a sufficient connection to a person or entity in this country. See *ante*, at 11– 12. The compromise also will invite a flood of litigation until this case is finally resolved on the merits, as parties and courts struggle to determine what exactly constitutes a "bona fide relationship," who precisely has a "credible claim" to that relationship, and whether the claimed relationship was formed "simply to avoid §2(c)" of Executive Order No. 13780, *ante*, at 11, 12. And litigation of the factual and legal issues that are likely to arise will presumably be directed to the two District Courts whose initial orders in these cases this Court has now— unanimously—found sufficiently questionable to be stayed as to the vast majority of the people potentially affected.