TRAXLER, Circuit Judge, dissenting:
I agree with my dissenting colleagues insofar as they hold that the plaintiffs lack standing to assert their claims under the Immigration and Nationality Act. Accordingly, I do not reach the merits of those claims.
With regard to the plaintiffs' claim that Proclamation No. 9,645 likely violates the Establishment Clause of the United States Constitution, I believe they have standing to assert it. In my view, an American person or an American entity has standing to bring a colorable Establishment Clause claim in our courts when a close member of that person's family or a person with a legitimate connection to the American entity is seeking entry into the United States and is being denied entry solely because of religion. See Trump v. IRAP , --- U.S. ----, 137 S.Ct. 2080, 2089, 198 L.Ed.2d 643 (2017). We are a country founded predominantly by immigrants, many of whom came here to escape religious discrimination and obtain religious freedom. Indeed, our forefathers used the first words of the very first amendment to the Constitution to guarantee religious freedom. It would be ironic indeed for us to repudiate this core constitutional principle. On this issue I believe the Supreme Court has given us guidance. Cf. id. ("An American individual or entity that has a bona fide relationship with a particular person seeking to enter the country as a refugee can legitimately claim concrete hardship if that person is excluded.").
Like my dissenting colleagues, however, I believe the plaintiffs' constitutional claims fail on the merits, and I would reverse the district court and vacate its preliminary injunction. President Trump issued Executive Order No. 13,769 (EO-1), on January 27, 2017, seven days after his inauguration. The President issued Executive Order No. 13,780 (EO-2) on March 6, 2017, in direct response to litigation that challenged EO-1. On its face, EO-2 suspended the entry of nationals from six Muslim-majority countries for 90 days. This temporary suspension was imposed to allow Executive officials time to conduct a worldwide review of the adequacy of information that foreign governments were providing about their nationals who applied for United States visas. See IRAP v. Trump , 857 F.3d 554, 573-74 (4th Cir.) (en banc), vacated and remanded , --- U.S. ----, 138 S.Ct. 353, 199 L.Ed.2d 203 (2017).
In the appeal involving EO-2, I voted to affirm the district court's issuance of a preliminary injunction on Establishment Clause grounds. My vote was based on the temporal proximity of EO-1 and EO-2 to the well-documented and religious-based statements about Muslims made by President Trump prior to and immediately after his inauguration; the absence of any demonstrated, meaningful study or consultation with the President's advisors prior to his issuance of these Orders; and the insufficient factual basis proffered by the Executive in support of its claim that the Order had a non-religious purpose. See Trump, 857 F.3d at 606 (Traxler, J., concurring in *378 the judgment). Although EO-2 was "facially legitimate," I concluded plaintiffs had made a sufficient preliminary showing that national security may not have been the "bona fide" reason for its hasty issuance. Kleindienst v. Mandel , 408 U.S. 753, 770, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972).
Unlike EO-1 and EO-2, in my view Proclamation No. 9,645 has sufficiently addressed these concerns. Although the factors that drove my prior decision are still relevant, I must now view them in the context of the investigation and analysis that the agencies acting on the President's behalf have completed, the consultation that has taken place between the President and his advisors, and the logical conclusions and rationale for the Proclamation that are documented therein. In light of the extreme deference that courts must always give the President in matters of foreign policy and national security, as well as the additional information before the court, I believe the balance of the equities no longer favors the plaintiffs. Therefore, I respectfully dissent.
AGEE, Circuit Judge, with whom Judge NIEMEYER and Senior Judge SHEDD join, dissenting:
I respectfully dissent. While I join fully in the excellent dissenting opinion of Judge Niemeyer, I write separately on the standing issue as to claims under the Establishment Clause.
I.
The United States Constitution extends to federal courts the power to adjudicate "cases" and "controversies." U.S. Const. art. III, § 2. "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife , 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The requirement that a party possess Article III standing to bring a suit in federal court ensures that the judicial branch observes this constitutional mandate. Massachusetts v. Mellon , 262 U.S. 447, 488, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) ("The functions of government under our system are apportioned. To the legislative department has been committed the duty of making laws, to the executive the duty of executing them, and to the judiciary the duty of interpreting and applying them in cases properly brought before the courts. The general rule is that neither department may invade the province of the other and neither may control, direct, or restrain the action of the other."); see also Allen v. Wright , 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ("[T]he 'case or controversy' requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded."), abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc. , 572 U.S. ----, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014) ; Warth v. Seldin , 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("This is the threshold question in every federal case, determining the power of the court to entertain the suit.").
To show standing, a plaintiff has the burden to show (1) an injury-in-fact (2) caused by the defendant (3) that will likely be redressable by a favorable decision. Defenders of Wildlife , 504 U.S. at 560-61, 112 S.Ct. 2130. An "injury-in-fact" is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Id. at 560, 112 S.Ct. 2130.[1] A *379 court need only find that one plaintiff has standing to permit the case to go forward. Massachusetts v. EPA , 549 U.S. 497, 518, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007).
The opinions of the majority and district court hold that the plaintiffs have pled injuries caused by the Proclamation in the form of "prolonged separation from close family members" and stigmatization as a basis for Establishment Clause standing. Majority Op. 260; accord Int'l Refugee Assistance Project v. Trump (IRAP) , 265 F.Supp.3d 570, 600-01 (D. Md. 2017) (concluding that the plaintiffs have suffered an injury in the form of "feelings of marginalization" and "prolonged separation from close relatives who would be barred from entry to the United States under the Proclamation"). They err in both respects. None of the plaintiffs in this case have Article III standing for the constitutional claims asserted. Therefore, the district court had no authority to adjudicate their Establishment Clause claims.
A.
The Establishment Clause of the First Amendment restricts the Government from "mak[ing any] law respecting an establishment of religion." U.S. Const. amend. I. In Valley Forge Christian College v. Americans United for Separation of Church & State, Inc. , 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), the Supreme Court addressed the standing requirements for plaintiffs alleging violations of the Establishment Clause. After the Government conveyed a tract of land to a religious college, an ideological organization and some of its employees brought suit, alleging an infringement of their First Amendment rights under the Establishment Clause. Id. at 467-69, 102 S.Ct. 752. The Court recognized that "[t]he judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutionality of legislative or executive acts." Id. at 471, 102 S.Ct. 752 ; see also id. at 473, 102 S.Ct. 752 ("Were the federal courts merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding, the concept of 'standing' would be quite unnecessary.").
Thus, on standing grounds, the Court rejected the claims in Valley Forge by those plaintiffs who "fail to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees." Id. at 485, 102 S.Ct. 752. The Court noted that the plaintiffs "were [not] subjected to unwelcome religious exercises or ... forced to assume special burdens to avoid them," id. at 486, 102 S.Ct. 752 n.22, and refused to relax Article III's standing requirements merely because "violations of the Establishment Clause typically will not cause injury sufficient to confer standing under the 'traditional' view of Art. III," id. at 489, 102 S.Ct. 752 ; see also id. ("But the assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing.... Were we to accept respondents' claim of standing in this case, there would be no principled basis for confining our exception to litigants relying on the Establishment Clause.").
Following Valley Forge , we elaborated on the basis for Establishment Clause standing in Suhre v. Haywood County , 131 F.3d 1083 (4th Cir. 1997). In Suhre , the plaintiff brought an Establishment Clause suit against the County because of its display of the Ten Commandments in the county courthouse. Id. at 1084. We recognized that "the concept of injury for standing purposes is particularly elusive in Establishment Clause cases" because the *380 plaintiffs are "not likely to suffer physical injury or pecuniary loss." Id. at 1085-86. We held that "[t]he injury that gives standing to plaintiffs in these cases is that caused by unwelcome direct contact with a religious display that appears to be endorsed by the state." Id. at 1086. Because the plaintiff came into direct contact with the religious display every time he visited the courthouse, he had standing for Establishment Clause purposes. Id. at 1090.
Later, in Moss v. Spartanburg County School District Seven , 683 F.3d 599, 602 (4th Cir. 2012), we addressed a suit challenging a school district's practice of permitting "students to be released for part of the school day in order to receive off-campus religious instruction." We rejected "the plaintiffs['] propos[al] that we adopt a per se rule that students and parents always have standing to bring suit against policies at their school when they allege a violation of the Establishment Clause, regardless of whether they allege or can prove personal injury." Id. at 605. Reaffirming that "[m]any of the harms that Establishment Clause plaintiffs suffer are spiritual and value-laden, rather than tangible and economic," the Court warned "against efforts to use this principle to derive standing from the bare fact of disagreement with a government policy, even passionate disagreement premised on Establishment Clause principles." Id. Thus, only those plaintiffs who had been personally exposed-and not just subject-to the school district's policy had standing to pursue their claims. Id. at 606-07.
Against this jurisprudential backdrop, the plaintiffs in this case do not have standing to pursue their Establishment Clause claims as pled. The majority and district court conflate two separate and distinct injuries specific to two separate and distinct causes of action to support a finding of Establishment Clause standing. They do so by lumping the "prolonged separation from close family members" concept, Majority Op. 260; accord IRAP , 265 F.Supp.3d at 600 ("prolonged separation from close relatives"), with stigmatization in an attempt to overcome the deficiency of a generalized grievance and the lack of precedent. See Defenders of Wildlife , 504 U.S. at 573-74, 112 S.Ct. 2130 ("We have consistently held that a plaintiff raising only a generally available grievance about government-claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large-does not state an Article III case or controversy."). Although a party may have standing to pursue one genre of claimed injury, that does not furnish standing for a different and distinct injury. As in this case, standing for purposes of an Immigration and Nationality Act ("INA") claim does not provide standing for an independent constitutional claim under the Establishment Clause.[2]
In that regard, the Supreme Court has made it clear that each claim must be able to individually meet standing scrutiny. DaimlerChrysler Corp. v. Cuno , 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) ("[A] plaintiff must demonstrate standing for each claim he seeks to press."); Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc. , 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) ("Laidlaw is right to insist that a plaintiff must demonstrate standing separately for each form of relief sought."); Wright , 468 U.S. at 752, 104 S.Ct. 3315 ("Typically, *381 however, the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."). Thus, a plaintiff cannot take an injury specific to one claim and use it to backdoor his way into another claim. See Town of Chester v. Laroe Estates, Inc. , 581 U.S. ----, 137 S.Ct. 1645, 1650, 198 L.Ed.2d 64 (2017) ("Our standing decisions make clear that standing is not dispensed in gross.").
The district court held that the plaintiffs have standing for Establishment Clause purposes because the Proclamation would prolong their separation from their alien relatives, the same basis as standing for the plaintiffs' separate statutory claim under the INA. See IRAP , 265 F.Supp.3d at 595-99 (INA) ; id. at 599-602 (Establishment Clause). In doing so, the district court took pains to hold that "prolonged separation from close family members" is a cognizable injury under the INA. Id. at 595-96. However, without any meaningful discussion or citation to relevant authority, the district court-and now the majority-simply pronounce by diktat that this prolonged separation likewise constitutes a cognizable injury under the Establishment Clause . Neither cites any case applying the Establishment Clause in this fashion.
The district court relied on Legal Assistance for Vietnamese Asylum Seekers v. Department of State (LAVAS ), 45 F.3d 469 (D.C. Cir. 1995), vacated on other grounds , 519 U.S. 1, 117 S.Ct. 378, 136 L.Ed.2d 1 (1996) (per curiam), to hold that the individual plaintiffs have suffered an injury via the "prolonged separation from close family members" for purposes of INA standing. IRAP , 265 F.Supp.3d at 596. In LAVAS , family members of Vietnamese refugees temporarily residing in Hong Kong sued after the U.S. Government informed the refugees that they would have to return to Vietnam before their visa applications would be processed. 45 F.3d at 470-71. The D.C. Circuit analyzed the statutory standing of the family members, which consisted of determining whether they "suffer[ed] the requisite injury in fact and [were] within the zone of interest protected by the INA." Id. at 471. With little discussion, the court determined that the family members had standing to sue because the Government's directive "prolong[ed] the separation of immediate family members." Id.
Regardless of whether the D.C. Circuit's INA holding is correct, it at least logically flows from the INA's statutory construction and legislative history. Citizens and permanent resident aliens participate in the visa application process under the INA as sponsors of their foreign family members. See 8 U.S.C. § 1154. As the LAVAS court recognized, "[i]n originally enacting the INA, Congress implemented the underlying intention of our immigration laws regarding the preservation of the family unit." 45 F.3d at 472. It is therefore traceable to see the basis upon which the D.C. Circuit found the separation of family members to be a cognizable injury under the INA-that is, standing based on a particular statutory entitlement. But the court's opinion on statutory standing under the INA never addressed a constitutional standing claim.
Nonetheless, the district court in this case took that holding and made an inferential leap worthy of an Olympic long jumper. It reasoned that the prolonged separation of family members found under a statutory enactment transmogrifies into an injury for Establishment Clause purposes. This leap was made without citation to legal authority. Rather, the district court simply recited that the plaintiffs' alleged prolonged separation from family *382 members constituted "personal contact with the Proclamation's alleged Establishment Clause violation," and then proceeded without preamble to its analysis of the claim of stigmatization injury as if the two were one and the same. IRAP , 265 F.Supp.3d at 600.
As cursory as the district court's "prolonged separation" holding is, the majority opinion is even weaker. The majority engages in no discussion, provides no citation to relevant authority, but simply pronounces an Establishment Clause injury. See Majority Op. 259-60, 261. That is simply an exercise by fiat in order to reach the merits of the plaintiffs' Establishment Clause claims. Indeed, there is no Establishment Clause jurisprudence from the previous two centuries that supports the proposition that "prolonged separation" constitutes an injury under the Establishment Clause.
Even assuming the plaintiffs may represent third-party interests under the INA, their INA standing provides no bridge to status under the Establishment Clause. See Davis v. FEC , 554 U.S. 724, 734, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."). The individual plaintiffs' relatives and invitees and those people associated with the organizational plaintiffs have no constitutional right to enter the United States. See Kerry v. Din , 576 U.S. ----, 135 S.Ct. 2128, 2131, 192 L.Ed.2d 183 (2015) (plurality opinion); Kleindienst v. Mandel , 408 U.S. 753, 762, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). And no court-outside the current flood of litigation over the Proclamation and its predecessors-has found any similar Establishment Clause interest held by the aliens' family members in the United States. See Din , 135 S.Ct. at 2131 (stating that there is no "constitutional right to live in the United States with [a nonresident alien] spouse"). Further, the plaintiffs cannot claim to represent any constitutional interest on behalf of nonresident alien relatives or contacts because those aliens do not have any rights under the Establishment Clause. See United States v. Verdugo-Urquidez , 494 U.S. 259, 265, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (stating that "the people protected by the [First Amendment] refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community"). Rather, this constitutional interest has been birthed as a convenience by the district court and majority in this litigation as a basis to entertain a constitutional claim.
Because the "prolonged separation" argument fails, the plaintiffs are left with stigmatization as their sole Establishment Clause injury. Notwithstanding the precedential cautions of Valley Forge , Suhre , and Moss , the district court held that the individual plaintiffs had standing because of the stigmatization they allege to have suffered by virtue of the Proclamation's purported anti-Muslim sentiment. For example, one plaintiff "understands the Proclamation to fulfill campaign promises to condemn her religion," while another declares that the Proclamation "made him feel like a second-class citizen." IRAP , 265 F.Supp.3d at 600. Other plaintiffs "feel condemned, stigmatized, attacked, or discriminated against as a result of the Proclamation." Id. at 601. The district court held that "[t]hese feelings of marginalization constitute an injury in fact in an Establishment Clause case." Id. In a related vein, the district court also held that the organizational plaintiffs had standing to bring Establishment Clause claims on behalf *383 of their members.[3] The majority embraces the stigmatization holding of the district court.
But the stigmatization injuries the plaintiffs allege are insufficient alone to confer Establishment Clause standing. See Wright , 468 U.S. at 754, 104 S.Ct. 3315 (holding that "a claim of stigmatic injury, or denigration, suffered by all members of a racial group" is not "judicially cognizable" for an Equal Protection Clause claim). Assuming the Proclamation discriminates against foreign Muslims-a proposition not supported by its text-the plaintiffs have not shown that the Proclamation discriminates against them as the Proclamation is directed at aliens in foreign countries, with application only external to the United States. See id. at 755, 104 S.Ct. 3315 ("Our cases make clear, however, that such injury accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct." (emphasis added) ). The plaintiffs therefore fail to "allege a stigmatic injury suffered as a direct result of having personally been" subjected to the Proclamation's requirements. Id. The plaintiffs' claims of stigmatization are generalized grievances that are not judicially cognizable as injuries sufficient to invoke standing. See Hollingsworth v. Perry , 570 U.S. 693, 133 S.Ct. 2652, 2662, 186 L.Ed.2d 768 (2013) ("We have repeatedly held that such a generalized grievance, no matter how sincere, is insufficient to confer standing."); Ex Parte Levitt , 302 U.S. 633, 636, 58 S.Ct. 1, 82 L.Ed. 493 (1937) (per curiam) ("[I]t is not sufficient that [the plaintiff] has merely a general interest common to all members of the public.").
To sustain the holding of the district court that the plaintiffs' generalized stigma grievances are sufficient to support standing would require a finding that anyone with some sense of personal affront could bring a suit challenging the Proclamation under the Establishment Clause. See Wright , 468 U.S. at 755-56, 104 S.Ct. 3315 ("If the abstract stigmatic injury were cognizable, standing would extend nationwide to all members of the particular racial groups against which the Government was alleged to be discriminating by its grant of a tax exemption to a racially discriminatory school, regardless of the location of that school."); Chaplaincy of Full Gospel Churches v. U.S. Navy (In re Navy Chaplaincy ), 534 F.3d 756, 764 (D.C. Cir. 2008) ("Under plaintiffs' theory, every government action that allegedly violates the Establishment Clause could be re-characterized as a governmental message promoting religion. And therefore everyone who becomes aware of the 'message' would have standing to sue."). The plaintiffs' "claim that the Government has violated the Establishment Clause does not provide a special license to roam the [world] in search of governmental wrongdoing and to reveal their discoveries in federal court." Valley Forge , 454 U.S. at 487, 102 S.Ct. 752.
At best, the plaintiffs claim that they have suffered indirectly from the Proclamation's alleged inherent-albeit invisible-condemnations of their alien family members' religion. Such a claim contravenes the Article III requirement that the plaintiffs "show that [they] ha[ve] sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged official conduct." City of Los Angeles v. Lyons , 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (emphasis added).
II.
For these reasons, I conclude that the plaintiffs do not have standing to bring *384 their Establishment Clause claims. The district court and the majority err in holding otherwise. I respectfully dissent.

Proclamation No. 9645, Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats (the "Proclamation"), 82 Fed. Reg. 45,161 (Sept. 24, 2017).

The Government also argues that Plaintiffs' claims are not ripe. I adopt the Majority Opinion's ripeness analysis and conclude that the claims are ripe. Ante 261-63.

In fact, the Supreme Court has adjudicated similar claims on the merits. See Sale , 509 U.S. 155, 113 S.Ct. 2549, 125 L.Ed.2d 128 ; infra Part I.D.2.

"Designated Countries" throughout refers to the eight countries included in the Proclamation: Chad, Iran, Libya, North Korea, Somalia, Syria, Venezuela, and Yemen.

The Government claims that any visa applicant who attended an interview and is awaiting administrative processing has already been denied a visa. Third Cross-Appeal Br. 8. But this is belied by the record. The relatives of IRAP Plaintiffs Shapour Shirani and Fakhri Ziaolhagh had both been interviewed and were told their visas were in "administrative processing." J.A. 603 (Shirani), 606 (Ziaolhagh). Both relatives subsequently received their visas. Notice 1, Dec. 6, 2017, ECF No. 160.

The Government argues that the D.C. Circuit undermined these holdings in Saavedra Bruno , 197 F.3d at 1163-64. First Br. 24. Saavedra Bruno involved a challenge by a foreign national (Saavedra) and his company to the revocation of Saavedra's own nonimmigrant business/pleasure visa and denial of his work visa. 197 F.3d at 1155-56. But this was a direct challenge to the denial and revocation of an individual visa-which I agree is barred by consular nonreviewability-not a collateral challenge to the authority to issue a policy, as in LAVAS and this case. In addition, the D.C. Circuit concluded that the Saavedra's company and his U.S. citizen employee lacked standing because their petition to classify Saavedra as a managerial employee had been granted. Id. at 1163-64. Thus, Saavedra Bruno did not involve the prolonged separation of family members recognized as cognizable in LAVAS ; indeed, the court did not address LAVAS at all. Finally, the D.C. Circuit explicitly distinguished Saavedra Bruno , which involved a purely statutory claim, from Abourezk , which involved both statutory and constitutional claims brought by U.S. citizens, id. at 1156, 1163. Because Plaintiffs are U.S.-citizen family members bringing a collateral challenge involving statutory and constitutional claims, Saavedra is inapposite here.

Used in this way, a "cause of action" also differs from whether a plaintiff has stated a claim sufficient to survive a motion under Federal Rule of Civil Procedure 12(b)(6).

The Government also claims that the INA precludes judicial review. It is true that a suit cannot be brought under the APA if "statutes preclude judicial review" or if judicial review is otherwise unavailable. Id. §§ 701(a)(1), 702(1). But, as I explained in Part I.A, Congress has not clearly stripped federal courts of jurisdiction to review actions taken pursuant to § 1182(f) and § 1185, nor to cases alleging a violation of § 1152. And, as I explained in Part I.B, the consular nonreviewability doctrine is inapplicable here.

As the Majority Opinion explains, that the travel restrictions were not fully implemented before December 8, 2017, is not critical to my analysis. Ante 263 n.10. The agencies had already taken the final steps necessary to implement the restrictions and were only kept from doing so by two nationwide injunctions, one of which this Court reviews here. See, e.g. , DHS Fact Sheet, supra ; State Department Statement, supra .

The Government claims that Plaintiffs cannot invoke this Court's inherent authority because the "APA governs suits challenging government actions," citing 5 U.S.C. § 703. Third Br. 8. But nowhere in § 703 did Congress designate the APA as the exclusive mechanism to challenge executive action. To the contrary, the plain language of § 703 shows that Congress intended the opposite: the APA provides a cause of action where statutes do not. 5 U.S.C. § 703.
The Government also argues that this Court's "equitable authority is constrained by 'express and implied statutory limitations.' " Third Br. 8-9 (quoting Armstrong , 135 S.Ct. at 1385 ). The Government neglects to mention what statutory limitations it believes constrain this Court's authority, and I can find none. As stated in Parts II.A and II.B, neither Congress nor the separation of powers has precluded this Court's exercise of jurisdiction here.

I concur with the majority opinion's ripeness analysis from Section III.A.2.

The Proclamation also cites 8 U.S.C. § 1185(a) as a basis for the action taken. 82 Fed. Reg. at 45,161. That provision states: "Unless otherwise ordered by the President, it shall be unlawful-(1) for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe[.]" Section 1185(a)(1) does not confer any authority on the President. Rather, the provision imposes certain requirements on persons travelling to and from the United States, and renders unlawful their failure to comply with the requirements of the statute. Thus, my analysis proceeds under Section 1182(f) with the understanding that the "reasonable rules, regulations, and orders" the President prescribes would need to, at a minimum, align with the President's authority in Section 1182(f).

Although the term "suspend" also has been defined to encompass indefinite or permanent periods of time, see Black's Law Dictionary 1691 (3d ed. 1944), we do not focus exclusively on dictionary definitions of that term. As the plain meaning rule is an "axiom of experience," and not a rule of law, our analysis also draws on other evidence in determining Congress' intent. See Boston Sand & Gravel Co. v. United States , 278 U.S. 41, 48, 49 S.Ct. 52, 73 L.Ed. 170 (1928).

Moreover, the government embraces a sweeping view of the President's Section 1182(f) authority, a view that would require this Court to accept that the President's authority is broad enough to permit the indefinite halt on immigration entirely by barring the entry of all aliens or the permanent restoration of the national-origin quota system.

For example, President Clinton invoked Section 1182(f) to suspend entry of Sudanese government and military officials for their failure to comply with a United Nations Security Council Resolution. See Proclamation No. 6958, 61 Fed. Reg. 60,007 (Nov. 22, 1996) ; see also Exec. Order No. 13,606, 77 Fed. Reg. 24,571 (Apr. 22, 2012) (suspending entry of certain persons associated with human rights abuses by the Iranian and Syrian governments).
The sole remaining order was President Reagan's restriction on Cuban immigrants that, for the reasons previously discussed, is distinguishable from the present Proclamation.

The INA does not define key elements of this requirement, such as "find" or "detrimental to the interests of the United States." See 8 U.S.C. § 1101 (defining terms used in the INA).

When the President's action falls outside the zone of congressionally delegated authority, the President "can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." Youngstown Sheet & Tube Co. v. Sawyer , 343 U.S. 579, 637, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). The Proclamation recites that the President has constitutional authority to issue the Proclamation, 82 Fed. Reg. at 45,161, and the government's briefs note this constitutional reference contained in the Proclamation. However, the Proclamation does not cite a particular constitutional basis for the President's action, see 82 Fed. Reg. at 45,161, and the government does not advance a particular constitutional argument detailing the source of any such constitutional authority. Accordingly, I do not address whether the President has alternative constitutional authority, independent of any statutory grant, to issue the Proclamation. See Eriline Co. S.A. v. Johnson , 440 F.3d 648, 653 n.7 (4th Cir. 2006) (holding that mere conclusory statements without supporting argument are insufficient to raise a merit-based challenge to a district court's order on appeal); Fed. R. App. P. 28(a)(8)(A) (requiring argument section of brief to contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies").

However, I conclude that the injunction should not apply to nationals from Venezuela and North Korea, because the balance of the equities favors the government with respect to nationals from those two countries.

Though there are eight opinions filed in this matter, only one opinion represents the holding and judgment of the Court: Chief Judge Gregory's opinion holding that the Proclamation is in violation of the Establishment Clause.
Two of the remaining seven present dissenting views from the majority's holding: Judge Niemeyer writes a separate opinion of which the part that responds to the Court's holding on the Establishment Clause is properly recognized as a dissenting opinion from this Court's holding on the Establishment Clause. And Judge Agee writes an opinion to dissent from the majority's position on standing under the Establishment Clause.
Of the remaining five opinions, Judge Traxler writes an opinion agreeing with the majority opinion's constitutional standing analysis, but rejecting the majority's conclusion on the merits of Plaintiffs' Establishment Clause claim. And the other four opinions (filed by Chief Judge Gregory, Judge Keenan, myself, and Judge Harris) are separate opinions expressing minority views that do not represent the holding and judgment of this Court. They are perhaps properly characterized as being dicta proprium or minority opinions that are not essential to the disposition of the case before us. Likewise, that part of Judge Niemeyer's separate opinion in response to those four opinions is not a dissent to the majority opinion's holding.

The Government also asserts that the Proclamation's bar on entry is authorized by Section 1185(a)(1) of the Immigration Act, which authorizes the President to prescribe "reasonable rules, regulations, and orders," as well as "limitations and exceptions," governing the entry and departure from the United States. 8 U.S.C. § 1185(a). The Government does not argue that Sections 1182(f) and 1185(a) confer meaningfully different powers on the President. And unlike Section 1185(a), which focuses on procedural and documentary regulations related to cross-border travel, Section 1182(f) is specifically tailored to the suspension of entry. Accordingly, I agree with Chief Judge Gregory, ante at 300-03, Judge Keenan, ante at 312 n.2, and the Ninth Circuit, Hawai'i , 878 F.3d at 694, that, at a minimum, Section 1185(a)(1) confers no greater authority on the President to deny entry to classes of aliens than Section 1182(f).

Chief Judge Gregory's opinion also relies on the so-called "major questions" doctrine as a basis for concluding that the Proclamation's indefinite suspension on entry exceeds the President's authority under Section 1182(f). Ante at 291-92. That doctrine, which also is sometimes referred to as the "major rules" doctrine, holds that "an agency can issue a major rule-i.e., one of great economic and political significance-only if it has clear congressional authorization to do so." U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n , 855 F.3d 381, 383 (D.C. Cir. 2017) (mem.). Whereas the Supreme Court has relied on the constitutional avoidance canons in numerous cases, including cases interpreting the Immigration Act and other immigration laws, see, e.g. , Zadvydas , 533 U.S. at 696-97, 121 S.Ct. 2491 ; Kent , 357 U.S. at 128-30, 78 S.Ct. 1113, the Court has applied the major questions doctrine in less than a handful of cases, and, based on my review, never in an immigration case, see, e.g. , King v. Burwell , --- U.S. ----, 135 S.Ct. 2480, 2489, 192 L.Ed.2d 483 (2015) ; FDA v. Brown & Williamson Tobacco Corp. , 529 U.S. 120, 160, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). Unlike the constitutional avoidance canons-which courts apply in the limited universe of cases that involve statutes that raise constitutional questions-the major questions doctrine has the potential to broadly empower the judiciary to strike down any executive action that it deems sufficiently "major," even if the action in no way implicates the Constitution. That no judicially accepted standard appears to have emerged for determining when a question is sufficiently "major" to warrant application of the doctrine renders the doctrine all the more difficult to apply. See U.S. Telecom , 855 F.3d at 383. Because the major questions doctrine (1) is far less widely accepted and applied than the constitutional avoidance canons; (2) has never been applied in immigration cases; and (3) lacks judicially accepted standards-notwithstanding its potential to provide the judiciary broad license to encroach on decisions traditionally reserved to the political branches-I believe that the constitutional avoidance canons, rather than the major questions doctrine, provide the proper interpretative basis for analyzing the Proclamation's compliance with Section 1182(f).

Congress's and the President's constitutional power to control immigration-and authority to delegate that control-fundamentally differs in a time of war. Korematsu , 323 U.S. at 224, 65 S.Ct. 193 (Frankfurter, J., concurring) ("[T]he validity of action under the war power must be judged wholly in the context of war. That action is not to be stigmatized as lawless because like action in times of peace would be lawless."). The Supreme Court's broadest statements regarding the scope of the President's delegated powers over immigration-which are relied upon by the Government-are in cases in which Congress expressly declared war or authorized the use of military force and empowered the President to deny entry to aliens as part of his prosecution of the relevant conflict. See, e.g. , Shaughnessy v. United States ex rel. Mezei , 345 U.S. 206, 210 & n.7, 73 S.Ct. 625, 97 L.Ed. 956 (1953) ("Congress expressly authorized the President to impose additional restrictions on aliens entering or leaving the United States during periods of international tension and strife [including] the present emergency [the Korean War]." (emphasis added) ); Knauff , 338 U.S. at 543, 70 S.Ct. 309 ("[B]ecause the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power, e.g., as was done here, for the best interests of the country during a time of national emergency [World War II]." (emphasis added) ). Accordingly, in such situations, the President was acting in concert with congressional authorization-i.e. , when executive power is at its highest ebb. See Youngstown Sheet & Tube Co. v. Sawyer , 343 U.S. 579, 637, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).
By contrast, neither Section 1182(f) nor the current version of Section 1185(a) were enacted pursuant to or in accordance with a declaration of war or authorization of use of military force, nor does the Government or the Proclamation claim that the President issued the Proclamation pursuant to authority conferred by a congressional declaration of war or authorization of use of military force against the subject countries.

See Kerry v. Din , --- U.S. ----, 135 S.Ct. 2128, 2142, 192 L.Ed.2d 183 (2015) (Breyer, J., dissenting) (stating that a United States citizen and resident has a procedural due process interest in knowing the Government's grounds for denying a visa application by her husband, an Afghan citizen with no claim to rights under the Constitution); id. at 2139 (Kennedy, J., concurring in judgment) (recognizing that a United States citizen may have "a protected liberty interest in the visa application of her alien spouse").

The Supreme Court's stay order necessarily indicated that the government made a "strong showing" that it was likely to succeed on the merits, Nken v. Holder , 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009), suggesting that we must proceed with additional caution before concluding that the plaintiffs have shown a likelihood of success on the merits, as required, see Winter v. Nat. Resources Def. Council, Inc ., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Yet, counsel for the plaintiffs maintained at oral argument that the Court's stay was of no moment to our review of the district court's preliminary injunction. Oral Argument 58:34.

Section 1182(f) provides:
Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation , and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.
(Emphasis added). And § 1185(a)(1) provides:
Unless otherwise ordered by the President, it shall be unlawful ... for any alien to depart from or enter ... the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.

The Proclamation makes an exception for certain Iranians who are seeking to enter the United States on nonimmigrant student and exchange-visitor visas but states that such individuals should "be subject to enhanced screening and vetting requirements." Id . § 2(b)(ii).